[No. D026292. Fourth Dist., Div. One. Aug. 4, 1999.]

CHARLES HEPPLER et al., Plaintiffs and Appellants, v.
J.M. PETERS COMPANY, INC., Defendant, Cross-complainant and
Respondent;
SIGNS & PINNICK, INC., et al., Cross-defendants and Respondents.

[No. D027470. Fourth Dist., Div. One. Aug. 4, 1999.]

CHARLES HEPPLER et al., Plaintiffs and Respondents, v.
MARTIN ROOFING COMPANY, INC., Defendant and Appellant;
J.M. PETERS COMPANY, INC., Defendant and Respondent.

1270

COUNSEL

Perwich, Goff, Karavatos, Daniel J. Perwich; Duke, Gerstel, Shearer & Bregante and Michelle Le Roux Burton for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Hawkins, Schnabel, Lindahl & Beck and Timothy A. Gonzales for Defendant and Appellant.

Shifflet, Kane & Konoske, Gary P. Sinkeldam and Amy E. Volk for Defendant, Cross-complainant and Respondent and for Defendant and Respondent.

Parker & Stanbury, Timothy D. Lucas; Mower, Koeller, Nebeker, Carlson & Haluck and Robert C. Carlson for Cross-defendant and Respondent Signs & Pinnick, Inc.

Borton, Petrini & Conron and Steven M. Shewry for Cross-defendants and Respondents Mueller-Lewis Concrete and Martin Roofing Company.

Elisa J. Nemeth for Cross-defendant and Respondent Art Torres Landscaping, Inc.

OPINION

HALLER, J.—These two appeals arise from construction defect litigation involving a residential development in northeast San Diego, in which the developer, J.M. Peters Company, Inc. (Peters), as part of a global settlement, assigned its indemnification rights against nonsettling subcontractors to plaintiffs—a certified class of homeowners, including Charles Heppler. In

the first appeal, plaintiffs appeal from a judgment entered after special verdicts that they take nothing from three of four nonsettling subcontractors whose contracts contained express indemnity clauses: Signs & Pinnick, Inc. (Signs); Art Torres Landscaping, Inc. (Torres); and Mueller-Lewis Concrete (Mueller). Plaintiffs also appeal the award of attorney fees and costs to the prevailing subcontractors. In the second appeal, the fourth subcontractor, Martin Roofing Company, Inc. (Martin), appeals the trial court's award of attorney fees and costs in favor of plaintiffs. For the reasons to be explained, we affirm the judgments related to plaintiffs' appeal. With respect to Martin's appeal, we affirm in part and reverse in part and remand with directions.

## PROCEDURAL AND FACTUAL BACKGROUND

In 1986, Peters and three other developers[1] entered into an agreement to grade a large tract of land and to landscape the common area for a development commonly known as Crestmont. On its quadrant of the tract, Peters developed Black Mountain Vistas North, Unit II, which consists of 152 single-family residences.

On February 6, 1987, Signs entered into a subcontract with Peters and the other developers to perform mass grading operations. On August 27, 1987, Peters and the other developers subcontracted with Torres to install irrigation and landscaping on the common area slopes owned by the homeowners association.[2] On July 20, 1987, Peters subcontracted with Martin to construct the roofs on all houses in its development. On October 1, 1987, Peters subcontracted with Mueller to design and build post tension concrete foundations and slabs for the residences in four of the five phases of the development.

Peters's subcontracts with Signs and Torres contained the following indemnification provision: "To the fullest extent permitted by law, Subcontractor hereby agrees to defend, indemnify and hold Contractor harmless from all claims, demands or liability for death or injury to persons or damage to property arising out of or in connection with Subcontractor's . . . performance of the Work and for any breach or default of the Subcontractor in the performance of its obligations under this Agreement. However this indemnification shall not apply if such claims, demands or liability are ultimately determined to have arisen through the sole negligence of Contractor."

[1] The other developers were: the Donald L. Bren Company, the William Lyon Company, and Woodcrest Homes.

[2] Torres was brought into the litigation by Peters as a cross-defendant in connection with a complaint filed by the homeowners association in San Diego Superior Court case No. 673983.

The contracts between Peters and Martin and Mueller contained the following indemnification provision: "Contractor does agree to indemnify and save Owner [Peters] harmless against all claims for damages to persons or to property growing out of the execution of the work, and at his own expense to defend any suit or action brought against Owner founded upon a claim of damage . . . ."[3]

On September 17, 1991, Heppler and other homeowners filed a complaint for breach of implied warranty, strict liability, negligence and nuisance against Peters alleging defective roofs and foundations and soil-related claims on behalf of themselves and all persons similarly situated.[4] On June 9, 1992, Peters filed a cross-complaint for indemnity against various subcontractors, including Signs, Mueller and Martin. On February 22, 1994, the Penasquitos Crestmont Homeowners Association (Association) filed a complaint against Peters for breach of implied warranties, strict liability, negligence and breach of contract alleging damage to the common area slopes. With respect to Association's lawsuit, Peters filed a cross-complaint for indemnity against Torres and Signs. On April 15, 1994, the trial court consolidated the class action lawsuit with Association's lawsuit. Neither the class action plaintiffs nor Association directly sued the subcontractors named in Peters's cross-complaints.

·Peters tendered its defense in the class action and Association lawsuits to Mueller, Martin, Signs and Torres, which either refused or did not respond to the tender.

In August 1995, Peters settled the class action lawsuit by agreeing to pay $5,314,500 and to assign its indemnity rights against nonsettling subcontractors to plaintiffs. The class action settlement made the following allocations: $900,000 toward roofing claims; $300,000 toward structural claims; and $4,114,500 toward soil claims. On September 5, 1995, the trial court determined the settlement was made in good faith. (Code Civ. Proc., § 877.6.)[5]

On December 22, 1995, Martin submitted a Code of Civil Procedure section 998 offer to compromise to Peters's cross-complaint against it for

---

[3]The language of the indemnity provision in Martin's and Mueller's subcontracts for the fifth phase of Peters's development is essentially the same.

[4]The court certified the class on June 25, 1993. The plaintiffs represent the owners of 71 residences.

[5]Association and Peters had earlier reached an independent settlement after Peters agreed to pay $1,240,116. On August 4, 1995, the trial court determined the settlement in Association's lawsuit was made in good faith. (Code Civ. Proc., § 877.6.) As part of the settlement with the class action plaintiffs, Peters also assigned to the plaintiffs its indemnity rights against nonsettling subcontractors in Association's lawsuit against Peters. The parties allocated $1,235,116 of the settlement in Association's lawsuit to soil claims; this allocation was made in the settlement agreement between Peters and the class action plaintiffs.

$220,000. The offer was deemed rejected after the jury was impaneled the following month.

The class action plaintiffs, standing in the shoes of Peters, proceeded to seek indemnity from the nonsettling subcontractors. In a series of pretrial rulings, the trial court:

—Determined plaintiffs would have to prove negligence and causation to trigger each subcontractor's indemnity obligation.

—Established the order of proof, with plaintiffs going first.

—Obtained stipulations from the parties that Peters had tendered its defense in the underlying complaints to the subcontractors and received rejections.

—Refused plaintiffs' request for evidentiary presumptions regarding plaintiffs' burden to show negligence, causation and damages against non-settling subcontractors; refused to tell the jury the court had previously issued an order finding the settlement and allocations were in good faith; and ruled the only effect of the good faith settlement order would be to establish the allocations as the "cap" of the indemnity obligation.

—Characterized the indemnity language in the Peters-Signs subcontract and the Peters-Torres subcontract as type I indemnity provisions and the language in the Peters-Martin subcontract and the Peters-Mueller subcon-tract as type II indemnity provisions. (See *MacDonald & Kruse, Inc.* v. *San Jose Steel Co.* (1972) 29 Cal.App.3d 413 [105 Cal.Rptr. 725].)

—Reserved jurisdiction to decide the effect of the indemnity provisions, postjury verdict, if the jury found negligence and causation as to any of the nonsettling subcontractors, and attorney fees and costs.

The jury heard the case between January 3, 1996, and February 21, 1996. On February 22, the jury returned special verdicts in favor of all the cross-defendants with the exception of Martin. The jury found Martin had been negligent and the negligence had caused damages totaling $117,000.

In postverdict proceedings, the trial court awarded the class action plain-tiffs $139,652.23 as contractual damages for Martin's failure to defend Peters pursuant to the indemnity provision, in addition to the $117,000 negligence jury verdict. The trial court also awarded plaintiffs, as prevailing party in the indemnity action, attorney fees and costs totaling $156,775.33,

for a total judgment against Martin of $413,427.56. (Civ. Code, § 1717; Code Civ. Proc., § 1032.)

With respect to Mueller, Signs and Torres, the trial court awarded these subcontractors attorney fees and costs and ordered plaintiffs to pay these fees and costs from the time the cross-complaint was filed.[6]

## DISCUSSION

### I. *Appeal by Class Action Plaintiffs*

Plaintiffs broadly attack a series of rulings, which they claim resulted in the jury hearing a negligence case rather than a breach of contract case. In essence, plaintiffs' appeal revolves around the trial court's ruling that the indemnity provisions at issue did not apply unless plaintiffs proved the subcontractors were at fault.

In addition to attacking the court's legal determination that subcontractor fault (negligence plus causation) was a prerequisite to trigger the contractual obligation to indemnify under these subcontracts, plaintiffs contend: (1) it was error to refuse to instruct the jury plaintiffs were entitled to a rebuttable evidentiary presumption that Peters was liable for the amount it paid to settle the claims against it and the allocations of the good faith settlement were reasonable; (2) they were denied their constitutional right to have the jury decide whether defendants breached the indemnity provisions of the subcontracts by the court's refusal to allow evidence and give jury instructions on the issue; and (3) the jury was given special verdict forms that were inconsistent with the jury instructions.

### A. *Indemnitor Negligence as Trigger to Indemnity Obligation*

■ The trial court ruled fault (negligence plus causation) by the subcontractors was a prerequisite to indemnity based on its interpretation of the subcontracts. Because the trial court construed the indemnity provisions here without the aid of extrinsic evidence, the interpretation of the provisions is a question of law for this court. (*Maryland Casualty Co.* v. *Bailey & Sons, Inc.* (1995) 35 Cal.App.4th 856, 868 [41 Cal.Rptr.2d 519].)

■ Our Supreme Court has characterized the obligation of indemnity as "the obligation resting on one party to make good a loss or damage another

---

[6]Signs was awarded $190,508 in attorney fees, $25,005.47 in expert fees and $25,119.39 in costs. Torres was awarded $109,816.20 in attorney fees, $25,123 in expert fees and $9,599.59 in costs. Mueller was awarded $86,050 in attorney fees and $18,713.69 in costs.

party has incurred." (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97]; see also Civ. Code, § 2772 ["Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person."].)

An express indemnity obligation is contractual in nature, "permitting great freedom of action to the parties in the establishment of the indemnity arrangements while at the same time subjecting the resulting contractual language to established rules of construction." (*E.L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 507 [146 Cal.Rptr. 614, 579 P.2d 505], fn. omitted.)

Over the past quarter of a century, California courts, when interpreting express indemnity agreements, generally have employed the three-type analysis set forth in *MacDonald & Kruse, Inc.* v. *San Jose Steel Co., supra,* 29 Cal.App.3d at pages 419-420, which focuses on the indemnitee's active or passive negligence.[7]

Recently, however, this court has eschewed a "mechanical application" of the *MacDonald & Kruse* rule, emphasizing instead a contractual interpretation. (*Hernandez* v. *Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1818-1823 [34 Cal.Rptr.2d 732]; see also *Maryland Casualty Co.* v. *Bailey & Sons, Inc., supra,* 35 Cal.App.4th at pp. 868-869.) This approach is in keeping with the teachings of our Supreme Court, which has cautioned against a strict application of the rule (see *Rossmoor Sanitation, Inc.* v. *Pylon Inc., supra,* 13 Cal.3d at pp. 628, 632 ["we do not employ the active-passive dichotomy as wholly dispositive of this or any other case"], and repeated criticism by many courts of the *MacDonald & Kruse* rules (see, e.g., *Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626 [151 Cal.Rptr. 399]).

---

[7] A type I agreement provides " 'expressly and unequivocally' that the indemnitor is to indemnify the indemnitee for, among other things, the negligence of the indemnitee." (*MacDonald & Kruse, Inc.* v. *San Jose Steel Co., supra,* 29 Cal.App.3d at p. 419.)

A type II agreement provides the indemnitee is indemnified for his own acts of passive negligence, but not his own acts of active negligence. (29 Cal.App.3d at p. 419.) Typical language is " 'howsoever same may be caused' [citation] or 'regardless of responsibility for negligence' [citation], or 'arising from the use of the premises, facilities, or services of [the indemnitee]' [citation], or 'which might arise in connection with the agreed work' [citation], or ' "caused by or happening in connection with the equipment or the condition, maintenance, possession, operation or use thereof" ' [citation], or 'from any and all claims for damages to any person or property by reason of the use of said leased property' [citation]." (*Ibid.*)

A type III agreement provides indemnification for liabilities caused by the indemnitor, but does not provide indemnification for liabilities caused by anyone else. (29 Cal.App.3d. at p. 420.)

■ In *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra*, 13 Cal.3d at page 633, the high court pointed out: "[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts."

Thus, parties to an indemnity contract have great freedom of action in allocating risk, subject to certain limitations of public policy. (See, e.g., Civ. Code, § 2782 [construction contracts cannot provide for indemnification for injury caused solely by indemnitee's negligent or willful conduct].) The parties may establish a duty in the indemnitor to save the indemnitee harmless from the results of his or her active negligence—provided the language is sufficiently specific and clear to evidence this intent. (See *E.L. White, Inc.* v. *City of Huntington Beach, supra*, 21 Cal.3d at p. 507.)[8] Likewise, the parties may require negligence by the indemnitor as a condition to indemnification (*Peter Culley & Associates* v. *Superior Court* (1992) 10 Cal.App.4th 1484, 1492 [13 Cal.Rptr.2d 624]), or they may establish a duty in the indemnitor to save the indemnitee harmless even if the indemnitor is not negligent (*Continental Heller Corp.* v. *Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500 [61 Cal.Rptr.2d 668]).

■ Turning to the indemnity provisions contained in these subcontracts, we find indemnitor fault was a prerequisite for indemnity. Given the contractual language and commercial context in which they arise, the indemnity provisions, reasonably read, did not obligate the subcontractors to indemnify Peters for Peters's liability unless such liability was attributable to them because of their negligent conduct.

Torres and Signs signed identical preprinted subcontracts supplied by one of the master developers (see fn. 1, *ante*), which contained indemnity language providing the subcontractors would defend and indemnify Peters for ". . . damage to property arising out of or in connection with Subcontractor's . . . performance of the Work and for any breach or default of the Subcontractor in the performance of its obligations under this Agreement."

---

[8]However, such agreements will be strictly construed against the indemnitee. (*Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 44 [41 Cal.Rptr. 73, 396 P.2d 377].) "In view of the general rule that an implied indemnity does not reach to protect the indemnitee from a loss to which his negligence has contributed, we must look at least for an express undertaking in the document that he is to do so. If one intends to do more than merely incorporate the general rule into the written document, he will be required to fix the greater obligation in specific terms." (*Ibid.*)

Paragraph 1 of the general conditions of these subcontracts defines the terms used in the contract and provides, "The use of the word 'work' is intended to include the materials furnished, as well as the labor required under this Agreement."

Martin and Mueller signed identical subcontracts on preprinted forms supplied by Peters, which contained language that the subcontractor "agree[s] to indemnify and save [Peters] harmless against all claims for damages to persons or to property growing out of the execution of the work, and at his own expense to defend any suit or action brought against [Peters] founded upon the claim of such damage . . . ." These fully integrated subcontracts also contained provisions requiring the subcontractors to adhere to a nonnegligent standard of care in the performance of their work.

The indemnity language contained in the preprinted subcontracts does not evidence a mutual understanding of the parties that the subcontractor would indemnify Peters even if its work was not negligent. Indemnity provisions are to be strictly construed against the indemnitee, and had the parties intended to include an indemnity provision that would apply regardless of the subcontractor's negligence, they would have had to use specific, unequivocal contractual language to that effect. (See *Goldman* v. *Ecco-Phoenix Elec. Corp., supra*, 62 Cal.2d at p. 44; see also *Continental Heller Corp.* v. *Amtech Mechanical Services, Inc., supra*, 53 Cal.App.4th at p. 505.) As this court has pointed out in *Smoketree-Lake Murray, Ltd.* v. *Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1737 [286 Cal.Rptr. 435], the specificity of the language used is a key factor in construction of an indemnity agreement. "[T]o obtain greater indemnity, more specific language must be used." (*Ibid.*)

Moreover, the attendant circumstances—subcontractors performing a limited scope of work that was to be combined with the work and materials of numerous others to build mass-produced residences—do not support an expansive indemnity obligation. Absent specific contractual language, the notion there was a meeting of minds that these subcontractors would be liable if they were not negligent does not pass scrutiny. Rather, it is much more credible the parties intended the subcontractors' indemnity obligation to arise only if the subcontractors performed negligently and caused damage. Contracts should be read in a manner that renders them reasonable and capable of being put into effect. (Civ. Code, § 1643.)

Plaintiffs' contention that language found in these contracts is sufficient to trigger indemnity obligations regardless of the indemnitor's fault also runs afoul of public policy considerations and decisional law, which impose

vastly different responsibility on a developer versus a subcontractor. In a case such as this, plaintiffs' position would have the effect of transferring Peters's strict liability as a developer to the subcontractors, without the use of specific contractual language that unambiguously manifested this intent.

However, the law makes a distinction between the liabilities of a housing developer and those of a subcontractor for defects in construction; namely, the developer is strictly liable and the subcontractor is not. (*La Jolla Village Homeowners' Assn.* v. *Superior Court* (1989) 212 Cal.App.3d 1131, 1143-1145 [261 Cal.Rptr. 146].) Residential developers are held strictly liable because of a recognition they are the best positioned to bear the costs associated with construction defects and the best positioned to monitor and coordinate construction from start to finish. Developers "usually [are] the best capitalized and most likely insured of the various entities involved in home construction." (*Id.* at p. 1145.) Also, residential developers are held strictly liable because they are essentially the manufacturers of the finished product or residence, as well as the marketer (distributor) of the finished product. The strict liability of residential developers therefore is in keeping with the public policy behind the doctrine of strict liability, which evolved to afford protection to individual consumers by fixing responsibility for injuries caused by defective products where it will most efficiently reduce safety hazards inherent in defective products in the marketplace. (See *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) As we stated in *La Jolla Village Homeowners' Assn.* v. *Superior Court, supra,* 212 Cal.App.3d at pages 1145 to 1146, "Recognizing the distinctions between a developer and a subcontractor places the liability for defects in construction where the responsibility and spoils lay. Moreover, the realities of the real estate construction/development business weigh heavily in deciding against an extension of strict liability to subcontractors. To extend the doctrine to the subcontractors would seriously impact that industry and the home-buying public. The additional costs to the subcontractor for insurance premiums for the newly created exposure would be passed on to developers who in turn would pass the costs on to the consumer, resulting in higher housing costs."

Plaintiffs rely on *Continental Heller Corp.* v. *Amtech Mechanical Services, Inc., supra,* 53 Cal.App.4th 500, in which the Court of Appeal held an indemnity provision that required a subcontractor to indemnify a contractor for loss which " '*arises out of or is in any way connected* with the performance of work under this Subcontract' " and " 'shall apply to *any acts or omissions,* willful misconduct or negligent conduct, <u>whether active or passive, on the part of Subcontractor</u>' " did not require that the loss be caused by subcontractor's fault. (*Id.* at p. 505, original italics, underscoring added.) However, that case is clearly distinguishable.

Continental Heller, a general contractor, paid $20,000 to settle claims against it arising out of an explosion caused by a defective valve installed 10 years earlier by subcontractor Amtech in a refrigeration system at a plant where several employees were injured. Even though Amtech was found not to be at fault for the explosion, the Court of Appeal upheld Amtech's liability for the $20,000 Continental Heller had paid to settle claims of injured workers based on the indemnity language in the subcontract.

Rejecting the notion that every cause of action for indemnity requires a showing of fault on the part of the indemnitor, the *Continental Heller* court found the contractual language before it "leaves no doubt the parties intended Amtech should indemnify Continental irrespective of whether Continental's loss arose by reason of Amtech's negligence or for any other reason except for the sole negligence or willful misconduct of Continental. (See Civ. Code, § 2782.)" (*Continental Heller Corp.* v. *Amtech Mechanical Services, Inc.*, *supra*, 53 Cal.App.4th at p. 505.)

Here, the indemnity provisions of the subcontracts do not contain the " 'shall apply to any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of Subcontractor' " (53 Cal.App.4th at p. 505, italics omitted) language or any similar language that specifies the *indemnitor's* conduct or fault is of no consequence in determining whether the indemnity obligation is triggered.

Also significantly, the *Continental Heller* court found the risk allocation in the indemnity language was "commercially reasonable" because Amtech, which selected and installed the valve that subsequently failed, could better protect against loss arising out of its performance. (*Continental Heller Corp.* v. *Amtech Mechanical Services, Inc.*, *supra*, 53 Cal.App.4th at p. 506.) The court also found "nothing unconscionable about the risk allocation in the agreement. This is not a case of a small-time subcontractor being saddled with ruinous liability for the mere privilege of installing a valve in a meat packing plant. . . . Amtech is a large, sophisticated company which had the opportunity to, and did in fact, negotiate the terms of its subcontract with Continental. . . ." (*Id.* at p. 507, fn. omitted.)

Furthermore, *Continental Heller* involved one contractor and one subcontractor. The subcontractor was positioned to control its work. In contrast, there were many subcontractors involved in developing Crestmont, the subcontractors had only one specific job or component part of the project to perform, and they were subject to the Peters's supervision. These subcontractors did "not control the trades which precede[d] or follow[ed] [them] on the job." (*La Jolla Village Homeowners' Assn.* v. *Superior Court, supra*, 212

Cal.App.3d at p. 1144.) Supervision and exclusivity of control are factors central to the imposition of tort responsibility based on strict liability. (*Id.* at pp. 1144-1145.)

Moreover, as discussed above, the commercial context here is markedly different than that of *Continental Heller.* Here, we are dealing with a typical general contractor/developer-subcontractor relationship as discussed in *La Jolla Village Homeowners' Assn.* v. *Superior Court, supra,* 212 Cal.App.3d at pages 1144 to 1145. "[T]he developer usually is the best capitalized and most likely insured of the various entities involved in home construction. The subcontractor is typically a smaller entity, with less capital and less insurance." (*Id.* at p. 1145.) Indeed, if the indemnity obligation were imposed here without fault, this case would become "a case of . . . small-time subcontractor[s] being saddled with ruinous liability . . . ." (*Continental Heller Corp.* v. *Amtech Mechanical Services, Inc., supra,* 53 Cal.App.4th at p. 507.)

 The trial court correctly determined that negligence on the part of these subcontractors was necessary to trigger the indemnity obligation as provided by the subcontracts.[9]

### B. *Instructions on Good Faith Settlement and Allocations*

Plaintiffs contend the trial court erred by not instructing that plaintiffs were entitled to rebuttable evidentiary presumptions that (1) *Peters* was liable for the *total* amount paid to settle the claims against it, and (2) the *allocations* made in the earlier good faith settlement between Peters and plaintiffs were reasonable. We conclude the jury was effectively informed of the presumption regarding the total amount of the settlement, and there is no merit to plaintiffs' contention regarding the presumption about the reasonableness of the allocations.

### *Presumption Peters Is Liable for Total Amount of Settlement*

In *Peter Culley & Associates* v. *Superior Court, supra,* 10 Cal.App.4th at page 1497, the Court of Appeal noted a good faith settlement is "presumptive evidence of liability of the indemnitee and of the amount of liability, but it may be overcome by proof from the indemnitor that the settlement was unreasonable (e.g., unreasonable in amount, entered collusively or in bad faith, or entered by an indemnitee not reasonable in the belief that he or she had an interest to protect)."

---

[9]Although plaintiffs' briefs focused on this issue as their primary assignment of error, at oral argument, plaintiffs' counsel conceded that negligence was an element his clients were required to prove, and abandoned any reliance on *Continental Heller.*

However, neither Peters's liability nor the reasonableness of the *total* amount of the settlement was in dispute. Moreover, while the trial court rejected plaintiffs' requested instructions on rebuttable presumptions, the court did instruct the jury, pursuant to BAJI No. 2.60, that the nonsettling subcontractors had the burden of proving the amounts Peters paid to settle the lawsuits were unreasonable. Such a shift of the burden of proof is the practical effect of a rebuttable presumption that *Peters* was liable for the total amount it paid to settle the lawsuit against it. Thus, the BAJI No. 2.60 instruction provided essentially what plaintiffs had sought with an instruction stating there was a rebuttable presumption that *Peters* was liable for the amount it paid in the settlement.

It appears what plaintiffs in fact wanted was an instruction that they were entitled to a rebuttable presumption that *nonsettling subcontractors*—not Peters—were liable for the amounts Peters paid to settle the claims. But the law does not so provide.

■ Contrary to plaintiffs' contentions, these subcontractors, who promised to indemnify Peters against damages caused by their negligent work, did not assume the role of liability insurers. Liability insurers protect insureds against damage or liability from generally defined risks in exchange for a premium. (*Herrick Corp.* v. *Canadian Ins. Co.* (1994) 29 Cal.App.4th 753, 763 [34 Cal.Rptr.2d 844].) Insurers have a distinct and free-standing duty to defend their insureds (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168]) as opposed to indemnitors, whose duty to defend is not triggered until it is determined that the proceeding against the indemnitee is "embraced by the indemnity." (Civ. Code, § 2778, subd. 4; see also *Regan Roofing Co.* v. *Superior Court* (1994) 24 Cal.App.4th 425, 436-437 [29 Cal.Rptr.2d 413] [duty to defend stemming from insurance policy is broader in part because it is an adhesion contract].) Plaintiffs' reliance on a line of insurance coverage cases (e.g., *Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775 [244 Cal.Rptr. 655, 750 P.2d 297]) is misplaced.

### Requested Presumption Regarding Allocations

■ As to plaintiffs' request for a rebuttable presumption instruction regarding *allocations* in the earlier settlement, the trial court properly refused to give it.

Because a good faith settlement determination has presumptive effect in an indemnity action only if it resulted from adversary negotiations, the plaintiffs were not entitled to a rebuttable presumption the allocations in the

settlement were reasonable. (*Peter Culley & Associates* v. *Superior Court*, *supra*, 10 Cal.App.4th at p. 1498.)

"[T]he allocation of the settlement amount had no effect on [the indemnitee]; [the indemnitee (here Peters)] would pay [the same amount] regardless of how the settlement was allocated, and [the indemnitee] assigned to [the assignee (here class plaintiffs)] the only significant indemnification rights. Although [the assignee], as possessor of the indemnification rights, would benefit from a high allocation, a high allocation would not in any way be detrimental to [the indemnitee]. Consequently, neither party had a motivation to allocate other than a high amount to [the indemnitor's] potential liability for [construction] defects.

". . . We find . . . no justification for giving presumptive effect to an allocation that is not the product of adverse negotiation. A presumption that the parties have reasonably allocated a settlement amount between issues in the action should be reserved for a settlement by parties with truly adverse interests in the allocation. [Citation.] Where the parties have purported to settle an imaginary dispute over allocation, that allocation should be given no special treatment in an indemnity action. Plaintiff should be required to prove the reasonableness of its proposed allocation by ordinary means." (10 Cal.App.4th at p. 1498; see also *Gouvis Engineering* v. *Superior Court* (1995) 37 Cal.App.4th 642, 650-651 [43 Cal.Rptr.2d 785].)[10]

Plaintiffs, in seeking a rebuttable presumption that the allocations in the good faith settlement were reasonable, have blurred and confused the distinctions between good faith confirmation hearings, which address equitable indemnity issues, and proceedings to enforce contractual indemnity, where "reasonableness," does not equate with "good faith."

It is precisely because these two terms superficially seem to connote the same meaning that we cannot lose sight of the fact that "good faith" is a term of art in the context of Code of Civil Procedure sections 877 and 877.6. An adjudication that a settlement was made in "good faith" under Code of Civil Procedure sections 877 and 877.6 bars cross-complaints against the settling

[10]With respect to Torres, plaintiffs claim they were entitled to an evidentiary presumption that the allocations in the good faith settlement between Peters and plaintiffs were reasonable fails for another reason as well. Torres was brought into this litigation as a cross-defendant in the Association lawsuit. (See fn. 2, *ante*.) Torres was not a cross-defendant to the plaintiffs' lawsuit against Peters. The good faith settlement between Peters and Association did not contain an allocation. In the settlement between Peters and the class action plaintiffs, there was no allocation of liability against Torres. The only mention of Torres in the settlement between Peters and class plaintiffs was Peters's assignment of its indemnity rights against Torres to class plaintiffs. (See fn. 5, *ante*.) Since no allocation of liability against Torres had been established, there was no basis for any presumption based on a prior allocation.

parties and provides an offset to nonsettling tortfeasors against their remaining liability. (*Gouvis Engineering* v. *Superior Court, supra*, 37 Cal.App.4th at p. 648.) Code of Civil Procedure section 877.6 allows a settling tortfeasor to insulate itself from contribution and equitable indemnity claims. (*Maryland Casualty Co.* v. *Bailey & Sons, Inc., supra*, 35 Cal.App.4th at p. 876.) Thus, these statutes provide a *"defensive"* procedure by which a joint tortfeasor may extricate itself from a lawsuit and bar actions for equitable indemnity by the remaining joint tortfeasors. (*Peter Culley & Associates* v. *Superior Court, supra*, 10 Cal.App.4th at p. 1488, original italics.)

The fundamental inquiry in a good faith hearing pursuant to Code of Civil Procedure sections 877 and 877.6 is whether the settling defendant is paying the plaintiff an amount that is so far below defendant's proportionate share of liability as to be completely " 'out of the ball park.' " (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 [213 Cal.Rptr. 256, 698 P.2d 159].) In an indemnity action, the crucial question is whether the settling indemnitee acted unreasonably by paying too much, thereby acting as a volunteer. "[I]n an indemnity action, the critical issue is not good faith, but *reasonableness.*" (*Peter Culley & Associates* v. *Superior Court, supra*, 10 Cal.App.4th at p. 1498, original italics.) Where, as here, Peters is strictly liable (*La Jolla Village Homeowners' Assn.* v. *Superior Court, supra*, 212 Cal.App.3d 1131) and the subcontractors are liable only if they were negligent, neither Peters's liability nor the reasonableness of the total amount Peters paid is in dispute. Rather, the issue is whether or not the allocations set forth in the settlement were unreasonably high. (*Peter Culley & Associates* v. *Superior Court, supra*, 10 Cal.App.4th at p. 1498.)

Because of critical distinctions, the court's earlier good faith finding under Code of Civil Procedure section 877.6 had no relevance in the indemnity trial. Moreover, the apparent similarity in terms could have easily misled the jury without a time-consuming and intricate explanation of the difference between a good faith settlement and a reasonable allocation of settlement proceeds.

While the court refused to give the requested presumption instruction, it allowed plaintiffs to present evidence regarding the amount of Peters's settlements, the fact plaintiffs were seeking indemnification from the subcontractors for that amount, expert testimony regarding the nonsettling subcontractors' liability for specific defects, and the cost of repairing the defects and other evidence probative of the reasonableness of the settlement.

Finally, we are not persuaded by plaintiffs' attempt to use the earlier good faith adjudication as a punitive "hammer" in conjunction with Civil Code

section 2778, subdivision 5. Civil Code section 2778, subdivision 5, provides that if an indemnitor refuses a request to defend an indemnitee, "a recovery against the [indemnitee] suffered by him in good faith[] is conclusive in his favor against the [indemnitor] [.]" In *Peter Culley & Associates* v. *Superior Court, supra,* 10 Cal.App.4th at page ·1495, the Court of Appeal rejected an argument that "the juxtaposition in Civil Code section 2778, subdivision 5 of the term 'good faith' with the words 'is conclusive' makes the court's good faith determination in a contractual indemnity case similar to such a determination in [Code of Civil Procedure] section 877.6 proceedings." As pointed out by the Court of Appeal, "recovery" in Civil Code section 2778, subdivision 5, refers only to a recovery by judgment against the indemnitee. (*Peter Culley & Associates* v. *Superior Court, supra,* 10 Cal.App.4th at pp. 1495-1496.)

## C. *Right to a Jury Trial*

Plaintiffs claim certain adverse evidentiary rulings prevented them from presenting their contract claims to the jury, in violation of their constitutional right to a jury trial. (Cal. Const., art. I, §§ 7, 15.) We are unpersuaded and view this contention as merely another way to attack the determinative issue of this case, namely, the trial court's ruling that each subcontractor's duty to indemnify is only triggered by a showing of its negligence.

■ The interpretation of a written contract is a question of law for the trial court to determine. (Evid. Code, § 310, subd. (a); *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] ["solely a judicial function"].) Thus, it was for the trial court to determine, as a matter of contract interpretation, whether plaintiffs' loss was within the terms of the indemnity agreements.

Under the trial court's interpretation, the indemnity provisions of the subcontracts did not apply unless the plaintiffs first proved negligence on the part of the indemnitors or subcontractors. Negligence is a factual issue, which was properly placed in the hands of the jury. (Evid. Code, § 312.)

Here, given the parties' stipulations regarding Peters's indemnity tenders and the subcontractors' rejections, the trial court properly carved out the legal issues involving interpretation of the contractual indemnity provisions for its own determination and had the jury decide the disputed factual issues. This was proper as a court has wide discretion in controlling the manner in which evidence is presented. (See *County of San Luis Obispo* v. *Bailey* (1971) 4 Cal.3d 518, 527 [93 Cal.Rptr. 859, 483 P.2d 27].) Plaintiffs' specific evidentiary complaints, considered singularly or cumulatively, do not constitute a deprivation of their right to a jury trial.

Specifically, the court's disallowance of exhibits of the indemnity provisions *during opening arguments* on foundational grounds was well within the court's discretion. (See *People* v. *Green* (1956) 47 Cal.2d 209, 215 [302 P.2d 307], overruled on another ground in *People* v. *Morse* (1964) 60 Cal.2d 631, 648-649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) In any event, we note the subcontracts, including the indemnity provisions, were admitted as exhibits during the presentation of evidence.

Similarly, the exclusion of evidence regarding the scope of the indemnity provisions and whether the losses were encompassed in the provisions was proper. Such evidence concerned issues of law, which were not before the jury for resolution.

There also was no error in excluding evidence that Peters made lawful tenders to the subcontractors and received rejections. Because the parties stipulated to these matters, there was no factual dispute for the jury to resolve. The ruling was consistent with the trial court's determination that the indemnity obligations were not triggered unless there was negligence on the part of the subcontractors, and the court's decision to narrow the issues presented to the jury. Accordingly, evidence of the tender and rejections was not relevant and properly excluded. (Evid. Code, §§ 350, 352.)

Plaintiffs also assign error to the court's refusal to allow evidence that the court had determined the settlement between plaintiffs and Peters to be in good faith or in the alternative to take judicial notice of the good faith determination. As we have previously determined, the rulings were correct since such evidence was irrelevant and would be confusing and misleading. (Evid. Code, §§ 210, 352.) The court correctly allowed plaintiffs to present evidence regarding the amount of Peters's settlements and the fact plaintiffs were seeking indemnification from the subcontractors for that amount. Likewise, plaintiffs presented evidence as to the nonsettling subcontractors' liability for specific defects at the project and the cost of repairing the defects. Peters's counsel testified before the jury about the negotiations and the consideration underlying the agreement—all of which was probative of the reasonableness of the settlement.

Plaintiffs also contend their right to a jury trial was impinged by the court's rejection of their proposed jury instructions on breach of contract, which effectively precluded the jury from considering a viable theory against the defendants. We are unpersuaded.

Plaintiffs correctly assert that each party has a right to have a jury instructed on all theories that are supported by the pleadings and the

evidence. (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].) However, they ignore the significance of the fact they and the subcontractors stipulated that Peters tendered and the subcontractors rejected the indemnity demands. Given these stipulations, once the jury made its factual determination regarding negligence and causation, the issue of whether there was a breach of contract would follow as a matter of law. Under such circumstances, it was permissible to leave pure legal determinations to the court, and to rely on the jury to resolve negligence, causation and damages. While it would have been proper for the court to have instructed the jurors that if they found negligence and causation they were to find breach of contract, no such instruction was requested.

Again, plaintiffs refuse to accept the court's legal determination that in order for the indemnity provisions to apply, plaintiffs must first prove the subcontractors were negligent. Since negligence, causation and damages were the only factual issues for the jury to resolve, the proposed contract jury instructions were superfluous to the issues before the jury and were properly rejected.

In any event, given the jury's factual determination of no negligence as to Signs, Torres and Mueller, plaintiffs were not prejudiced by the absence of jury instructions on breach of contract. Once the jury found no negligence, it would not have reached the breach of contract issues. Thus, plaintiffs cannot show the " 'error complained of has resulted in a miscarriage of justice' " or that " 'it seems probable' " the result would have been different if the jury had received breach of contract instructions. (*Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at p. 580.)

D. *Special Verdict Forms*

Plaintiffs contend the court committed reversible error by allowing the jury to make its findings on special verdict forms that did not adequately address Peters's negligence. Plaintiffs cannot prevail on this contention.

■ First, because plaintiffs did not submit special verdict forms that addressed Peters's negligence; the issue is waived on appeal. (*Olson* v. *Arnett* (1980) 113 Cal.App.3d 59, 66 [169 Cal.Rptr. 629].) Plaintiffs' belated references during posttrial proceedings to purported defects in the special verdict forms did not preserve the issue. We note during those posttrial proceedings plaintiffs did not fault the special verdict forms for failing to deal with Peters's negligence but rather on a different issue.

Second, the contention lacks substantive merit. Code of Civil Procedure section 624 provides in pertinent part: "[A] special verdict is that by which

the jury find[s] the facts only, leaving the judgment to the Court. The special verdict must present the conclusions of fact as established by the evidence . . . and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law."

Contrary to plaintiffs' assertion, the special verdict forms did address Peters's *active* negligence in question No. 4. ·Question No. 4 reads as follows:

"Was such damage also caused by the active negligence of J.M. Peters or by J.M. Peters' agent or servants?

"Answer 'yes' or 'no.'

"<u>Answer</u>: _____"

In the cases of Signs, Torres and Mueller, the jurors did not reach question No. 4 because in each instance they found the subcontractor was not negligent. Because the trial court correctly determined the predicate for indemnity under the contractual language was negligence by the indemnitors, the issue of Peters's negligence never became ripe with respect to Signs, Torres and Mueller. Accordingly, the special verdict forms were not defective for failing to address Peters's *passive* negligence because that issue was not necessary for the court to conclude whether there was an indemnity obligation on the part of the nonsettling subcontractors.

There also was no error in not addressing Peter's passive negligence in Martin's special verdict form. Martin was a type II indemnitor, and, as such, would have had an indemnity obligation if Peters was merely passively negligent. Active negligence subsumes passive negligence and by finding Peters was actively negligent, the jury resolved the determinative issue.

Plaintiffs have failed to demonstrate the special verdict forms were inadequate. (*Olson* v. *Arnett*, *supra*, 113 Cal.App.3d at p. 67.)

E. *Award of Attorney Fees to Signs, Torres and Mueller*

 Plaintiffs contend the trial court erred in ordering them—rather than Peters—to pay the prevailing subcontractors all of their attorney fees, including those incurred before the assignment. The contention is without merit.

Preliminarily, we note the issue litigated below was whether the prevailing subcontractors were entitled to an award of attorney fees, and, if so, from

whom, class plaintiffs or Peters.[11] The trial court found the attorney fee provisions within the subcontracts were assigned by Peters to plaintiffs and the prevailing subcontractors could assert their right to attorney fees under Civil Code section 1717 against plaintiffs. While the trial court did not explicitly address whether the responsibility for the attorney fees should be apportioned as between those fees incurred before and those incurred after the settlement agreement, the court did order plaintiffs to pay the total amount of fees awarded, including those incurred before and after the settlement agreement.

Central to the attorney fees issue were the subcontracts with Peters and the settlement agreement between Peters and plaintiffs. Each of the subcontracts contained an attorney fees provision that by operation of law (Civ. Code, § 1717) provided the prevailing party would be awarded attorney fees in any action brought on the subcontract. The settlement agreement contained an assignment provision between plaintiffs and Peters, which read: "J.M. Peters is assigning all its rights, including but not limited to indemnity rights and rights to fees and costs against cross-defendants . . . ."

Under the settlement agreement, Peters expressly assigned its right to attorney fees, but the agreement was silent as to a corresponding obligation to pay attorney fees. Hence, there was no direct assignment of the obligation to pay attorney fees under the subcontracts. In that regard, there was no facial ambiguity, and it was unnecessary to consider parol evidence to construe the settlement agreement. However, the question remained whether Peters's liabilities and obligations under the subcontracts were assigned by operation of law.

Here, the only act left to be performed under each of the executory subcontracts was the indemnity obligation—if indeed it had been triggered. (The attorney fee provision was a separate term of the subcontracts that was contingent on a party taking legal action to enforce the subcontract.) ▮ An assignment of rights under an executory contract does not impose upon the assignee the obligations of the assignor under the contract unless the assignee assumes these obligations. (*Griffin* v. *Williamson* (1955) 137 Cal.App.2d 308, 315 [290 P.2d 361].) However, an assumption of obligations may be implied from acceptance of benefits under the contracts. (Civ. Code, § 1589 ["A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the

[11]In their opening brief, plaintiffs argue only that they should not be held liable for the prevailing subcontractors' attorney fees incurred before the assignment. In their reply brief, plaintiffs ignore this argument and claim they are not responsible for any of the prevailing subcontractors' attorney fees.

facts are known, or ought to be known, to the person accepting."].) In determining whether there has been an assumption of the obligations from an assignment of rights, a court looks to the intent of the parties as indicated by their acts, the subject matter of the contract, or their words. (*Enterprise Leasing Corp.* v. *Shugart Corp.* (1991) 231 Cal.App.3d 737, 745 [282 Cal.Rptr. 620].)

After considering these factors, the trial court found that under the settlement agreement plaintiffs had assumed the rights and obligations associated with the attorney fee provisions of the subcontracts.

When a trial court has resolved a disputed factual issue, an appellate court reviews the ruling according to the substantial evidence rule. The trial court's resolution of the factual issue must be affirmed if it is supported by substantial evidence. (*Winograd* v. *American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378].) We look at the evidence in support of the trial court's finding, resolve all conflicts in favor of the respondent and indulge in all legitimate and reasonable inferences to uphold the finding. Substantial evidence supports the court's finding.

At a hearing outside the presence of the jury,[12] counsel for Peters testified that under the assignment plaintiffs would be responsible for the subcontractors' attorney fees if the subcontractors prevailed. This was the only testimonial evidence adduced at trial and it was uncontroverted.

Moreover, in settling its claims against Peters, plaintiffs agreed to dismiss Peters with prejudice and to waive any and all rights and benefits under Civil Code section 1542. Such language indicates plaintiffs and Peters agreed that Peters was no longer a player in the case.

By virtue of the assignment, plaintiffs became owners of Peters's indemnity rights and were completely in charge of the litigation. Plaintiffs chose to pursue each of the prevailing nonsettling subcontractors through trial. They had the option to settle with the subcontractors without incurring attorney fee obligations (Civ. Code, § 1717, subd. (b)(2)), but chose not to. Plaintiffs

---

[12]The hearing took place during trial after the subcontractors questioned the standing of plaintiffs to pursue the indemnity lawsuit if there was not a full assignment. The subcontractors were concerned about their potential liability for subrogation complaints by Peters's insurers if the class plaintiffs prevailed. Counsel for Peters was questioned whether he had authority from Peters's insurers to assign all rights. When asked who would pay attorney fees in the event the subcontractors prevailed, counsel for Peters replied it was his understanding under the assignment that plaintiffs would pay attorney fees. The trial court ruled the trial could proceed, and the issue of whether the assignment included liabilities would be dealt with after trial.

also had the power to dismiss the cross-complaints against the subcontractors and avoid any obligation for attorney fees. This is so because unless the cross-complaint went to judgment there would be no prevailing party within the meaning of Civil Code section 1717 and no one would have the right to recover attorney fees under the subcontracts. (*International Industries, Inc.* v. *Olen* (1978) 21 Cal.3d 218 [145 Cal.Rptr. 691, 577 P.2d 1031]; *Santisas* v. *Goodin* (1998) 17 Cal.4th 599, 602 [71 Cal.Rptr.2d 830, 951 P.2d 399]; Civ. Code, § 1717, subd. (b)(2).)

In short, the moment the plaintiffs took the assignment, they had total control of the litigation. Plaintiffs were primed to take the benefits of an award of attorney fees if they won; thus it was reasonable for the court to infer plaintiffs were prepared to take the concomitant obligation to pay attorney fees under Civil Code section 1717 if they lost.

Once we determine the trial court's findings have the requisite measure of support in the record, we cannot substitute our conclusions for those of the trial court. (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925].)

Nonetheless, we address the following evidence plaintiffs claim shows they and Peters did not intend an assignment of obligations:

—Counsel for Peters submitted a written offer setting forth "all material terms & conditions of settlement" and providing for an assignment of rights but "not including a delegation of duties"; plaintiffs claim the offer is evidence of the parties' intent and the settlement agreement reflects this intent by not including an assignment of duties. However, the settlement agreement contained an integration clause that explicitly states all prior understandings, representations and agreements are superseded. Moreover, if the parties agreed that the assignment did not include duties, they could have included such a provision in the settlement agreement. (See Civ. Code, § 1084 ["The transfer of a thing transfers also all its incidents, unless expressly excepted . . . ."].)

—The notice of the terms of the settlement to individual class members required by Code of Civil Procedure section 581, subdivision (k), and approved by the court did not apprise the class members of the potential liability for subcontractors' attorney fees in the event they prevailed; plaintiffs claim it would be inherently unfair to impose the obligation of paying prevailing subcontractors' attorney fees upon class members when the obligation was not identified in the notice of court's approval of the settlement. We disagree. The court's approval of the settlement agreement required

nothing more than a finding the settlement met the minimum threshold of fairness to the class members for resolution of the dispute at the time of the settlement. Plaintiffs cannot credibly argue that the assignment had no potential value. Had the jury accepted plaintiffs' view of the evidence, plaintiffs stood to recover as much as $5.1 million in property damages, $1.3 million in fees and costs incurred by Peters before the assignment, and their own fees and costs after the assignment.[13] The trial court was not charged with exploring all the possible consequences of the assignment. We cannot say plaintiffs were misled by the court's approval of the disclosure at the time the settlement was made.

—After the settlement and shortly before trial, Peters's counsel submitted a substitution of attorney form requesting class plaintiffs' counsel be substituted in as attorney of record in the indemnity action. Plaintiffs contend the substitution evidenced that Peters continued to be a party to the indemnity obligation and had not walked away from it. However, another reasonable inference could be drawn from this circumstantial evidence—namely, Peters substituted in plaintiffs' counsel because Peters had no need to worry about the outcome of the litigation since all the rights and obligations had been assigned to plaintiffs. When a reviewing court passes on evidence that is subject to opposing inferences, it must regard such evidence in the light most favorable to the trial court's finding. (*Winograd* v. *American Broadcasting Co.*, *supra*, 68 Cal.App.4th at p. 633.)

Contrary to plaintiffs' claim, we find the trial court's order that plaintiffs pay the attorney fees of the prevailing subcontractors was not unfair. An age-old maxim of equity is particularly appropriate here: "He who takes the benefit must bear the burden." (Civ. Code, § 3521.) Clearly, the plaintiffs were prepared to reap Peters's presettlement and their postsettlement attorney fees if they had prevailed in the indemnity trial. (See fn. 13, *ante.*)

The order also is in keeping with the application of the reciprocity principles of Civil Code section 1717 as applied to cases involving nonsignatories to a contract with an attorney fee provision. "Where a nonsignatory plaintiff sues a signatory defendant in an action on a contract and the signatory defendant prevails, the signatory defendant is entitled to attorney fees only if the nonsignatory plaintiff would have been entitled to its fees if the plaintiff had prevailed." (*Real Property Services Corp.* v. *City of Pasadena* (1994) 25 Cal.App.4th 375, 382 [30 Cal.Rptr.2d 536]; see also *Brusso* v. *Running Springs Country Club, Inc.* (1991) 228 Cal.App.3d 92, 108-111 [278 Cal.Rptr. 758].)

---

[13]In that regard, we note the notice to class members about the settlement refers to the $1.3 million in attorney fees and costs incurred by Peters.

## II. *Martin's Appeal*

As contractual damages for Martin's failure to defend Peters pursuant to the indemnity provision of the subcontract, the trial court awarded plaintiffs $139,652.23; this amount represented an apportioned total of Peters's attorney fees and costs up to the time of the assignment. The court also awarded plaintiffs—as prevailing party in the indemnity action—$156,775.33 in attorney fees and costs incurred by plaintiffs after the assignment. After plaintiffs filed a supplemental motion for attorney fees incurred in connection with posttrial motions, the court awarded an additional $16,471.25 in fees. Martin challenges these awards.

### A. *Damages Award of Peters's Attorney Fees and Costs*

Peters tendered its defense in the underlying lawsuit to Martin, which rejected the tender. Under the subcontract with Martin, Peters was entitled to indemnity for its losses, including attorney fees and costs, in defending and settling claims against it. Civil Code section 2778, subdivision 3 provides that unless a contrary intention appears "[a]n indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion[.]" By virtue of Peters's assignment, plaintiffs were properly awarded Peters's attorney fees and costs up to the time of the assignment as an item of damages for Martin's breach of its indemnity obligation.

Martin, however, contends the damages award was excessive with respect to the amount awarded for attorney fees, expert fees, and various costs.

Since these awards represent contractual damages, ". . . the determination of the recoverable fees must be made by the trier of fact . . . ." (*Brandt* v. *Superior Court* (1985) 37 Cal.3d 813, 819 [210 Cal.Rptr. 211, 693 P.2d 796].) Here, the trial court, sitting as the trier of fact in the posttrial proceedings, determined the amount of the damages awards. We review under the substantial evidence test.

### *Peters's Attorney Fees*

Plaintiffs presented the billing records of Peters's counsel and a declaration by Theodore Dikmen, who analyzed the bills to determine which amounts were attributed to Peters's defense of claims involving Martin's work. Dikmen placed the bills in three categories: those relating to the defense of soil issues only; those relating to the defense of roofing issues

only; and those relating to the general defense of Peters that benefited both soils and nonsoil issues. Dikmen found $5,093.50 of the attorney bills related solely to the defense of roofing issues. Of the $341,387.50 in attorney fees incurred in the general defense, Dikmen opined that 60 percent related to soil issues and 40 percent related to nonsoil issues. Dikmen further allocated one-half of the nonsoils general fees—20 percent of the total general defense fees or $68,277 to roofing issues. Dikmen justified this allocation by pointing out roofing issues were the largest of the nonsoils claims.

Martin presented a declaration prepared by its counsel, Eric J. Larson, who had reviewed the bills submitted by Dikmen's firm and opined the general fee allocation by Dikmen was excessive.

The trial court awarded as contractual damages the amount of attorney fees identified by Dikmen as attributable to Martin, noting Dikmen had worked on the case and had conducted a detailed review of the billing statements. The court explicitly found Dikmen's declaration to be accurate.

Substantial evidence supported the award of $73,370.50 for Peters's attorney fees.

### Expert Fees

Martin challenges expert fees of $48,025.01 that were awarded to plaintiffs as an item of contractual damages. At issue are the fees of two of Peters's experts. Again, Dikmen reviewed the experts' invoices and allocated a percentage attributed to roofing issues. Martin submitted opposing declarations by each of the experts. Dikmen filed a supplemental declaration, opining the experts' declarations were defective.

The trial court accepted Dikmen's allocation of the experts' invoices to Martin, noting the opposing declarations of the experts did not attribute any time for general preparation that would have involved Martin.

The question of the proper allocation of the experts' invoices was a highly litigated issue, and the trial court, sitting as the trier of fact, considered the conflicting evidence and found plaintiffs' position credible and reasonable. There was substantial evidence supporting the court's award for Peters's expert fees.

### Other Costs Awarded as Contractual Damages

The trial court awarded plaintiffs $182 for the filing fee associated with Peters's cross-complaint. Filing fees are expressly recoverable as costs under

the Code of Civil Procedure. (Code Civ. Proc., § 1033.5, subd. (a)(1).) Martin complains there is no support in the record showing Peters incurred this expense, and states this expense does not appear on any billing statement submitted to the court. Martin is mistaken. The expenditure of $182 for the filing fee of Peters's answer is listed on page 15 of the April 4, 1994, billing statement of the law firm representing Peters. The labeling error in the cost bill, which was prepared by plaintiffs' counsel, in referring to "filing fee for cross-complaint" is de minimis.

With respect to $4,600.04 in contractual damages awarded for costs incurred by Peters in taking various depositions, Martin claims there is no evidence showing what amounts Peters expended in connection with depositions. Martin is mistaken. The billing statements of Peters's counsel do show expenditures for depositions. Martin also complains it should only be charged with Peters's deposition expenditures that were related to Martin's part of the case. While we agree with this general proposition, it appears the $4,600.04 awarded represents only those deposition expenditures related to Martin's part of the case. Attachment 3(e) to the plaintiffs' cost bill lists the expenditures for the 14 depositions (involving 7 deponents) that were assessed against Martin. Martin disputes these expenditures related to it, but under the substantial evidence test we resolve all conflicts in favor of the respondent and indulge in all legitimate and reasonable inferences to uphold the finding.

Martin also attacks the contractual damages award of $13,474.68 for the costs Peters incurred in connection with mediation and special master fees. Martin claims that outside of plaintiffs' cost bill there is a total lack of support in the record for this award. The billing statements of Peters's counsel do show some expenditures for mediation and special master purposes; however, we have been unable to find within those statements expenditures totaling the amount awarded. Nonetheless, the trial judge, who handles the bulk of construction defect litigation in San Diego Superior Court, is well versed in the costs associated with mediating these cases and the fees charged by special masters. (See *Weber* v. *Langholz* (1995) 39 Cal.App.4th 1578, 1587 [46 Cal.Rptr.2d 677] [absence of documentation did not make attorney fee award improper].) Under these circumstances, we find the cost bill, signed under penalty of perjury, constituted substantial evidence to support the award. Martin also complains it should be charged only with the portion of Peters's mediation and special master expenses attributable to its case. We disagree. This is a type of expenditure that is not readily segregated according to issues or parties. Martin has failed to show the court erred in making this contractual damage award.

### B. *Plaintiffs' Award of Attorney Fees and Costs as Prevailing Party*[14]

### *Attorney Fees*

The subcontract specifically provides for recovery of attorney fees, incurred to enforce the contract. Civil Code section 1717, subdivision (a) provides such recovery shall be awarded to the prevailing party. With respect to attorney fees, the prevailing party is the party who recovered the greater relief in the action. (Civ. Code, § 1717, subd. (b)(1).)

Plaintiffs were entitled to an award of attorney fees because they were the prevailing party against Martin; the size of the award was within the sound discretion of the trial court. (See *Pehau* v. *Stewart* (1952) 112 Cal.App.2d 90, 97 [245 P.2d 692] [court which tried case may determine what amount would be reasonable].)

We review awards of attorney fees under an abuse of discretion standard. (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303].)

Martin contends the trial court abused its discretion in awarding $140,682.50 in attorney fees to plaintiffs on two grounds.

First, Martin unpersuasively argues a reasonable attorney fee award should be subject to a cap of 30 percent of the damages award because plaintiffs and their counsel had a contingency fee arrangement. However, while the record shows that there was a contingency agreement, the record does not disclose what the agreement was; hence, Martin is speculating when it suggests the agreement included a 30 percent figure.

Even if the record contained the figure agreed upon by plaintiffs and counsel, courts are not constrained by contingency agreements in making attorney fee awards. (See *Vella* v. *Hudgins* (1984) 151 Cal.App.3d 515, 520-521 [198 Cal.Rptr. 725]; *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 952-954 [218 Cal.Rptr. 839].) In awarding a reasonable fee, a court may consider a contingent fee agreement, but the agreement " 'is neither the sole factor nor a factor to be given any greater weight than any other . . . .' . . . [T]he contract is some evidence of the value of an attorney's services, but as with other items of evidence, it is not controlling." (*Vella* v. *Hudgins, supra*, 151 Cal.App.3d at p. 521.)

---

[14]Here because Martin's Code of Civil Procedure section 998 offer of $220,000 was exceeded by the damages award of $256,000 ($117,000 awarded by the jury plus $139,000 awarded by the trial court for contractual damages), the recent case of *Scott Co.* v. *Blount, Inc.* 20 Cal.4th 1103 [86 Cal.Rptr.2d 614, 979 P.2d 974], is not applicable to our analysis of the award of attorney fees and costs.

As our Supreme Court explained in *Serrano* v. *Priest, supra*, 20 Cal.3d at page 48, footnote 23: " 'The starting point for every fee award, once it is recognized that the court's role in equity is to provide just compensation for the attorney, must be a calculation of the attorney's services in terms of the time he has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.' [Citations.]"

It was not an abuse of discretion to rely on billing statements in awarding attorney fees.

■ However, we agree with Martin's second argument: the trial court erred by not apportioning the attorney fees award, which was based on the trial preparation and trial time (seven weeks) of plaintiffs' counsel. In this assigned indemnity proceeding, Martin was responsible for plaintiffs' attorney fees because Martin's contract with Peters contained an attorney fees provision. Martin's part of the case could have been tried in considerably less time than seven weeks had the trial not taken up issues that involved the other nonsettling subcontractors. It strikes us as eminently unfair to tag Martin with all of plaintiffs' attorney fees for the entire seven-week trial.

It is within the trial court's discretion to allocate awards of attorney fees. "The recognized barrier to segregation for purposes of calculating fee awards is inextricably intertwined issues. Thus, although time-keeping and billing procedures may make a requested segregation difficult, they do not, without more, make it impossible." (*Diamond* v. *John Martin Co.* (9th Cir. 1985) 753 F.2d 1465, 1467; see also *Fed-Mart Corp.* v. *Pell Enterprises, Inc.* (1980) 111 Cal.App.3d 215, 227 [168 Cal.Rptr. 525].)

Not all the issues involving Martin's case were integrally associated with the other issues in the case; at the very least, some of them could have been severed and isolated for purposes of the attorney fees award. Certainly, there were multiple days of trial that were devoted exclusively to soil issues.

While we are mindful of the trial court's wide discretion in making awards for attorney fees, we conclude, under these circumstances, the trial court's failure to apportion the attorney fees was an abuse of discretion. " 'A trial court's exercise of discretion is abused only when its ruling " 'exceeds the bounds of reason, all of the circumstances before it being considered.' " [Citation.]' " (*San Dieguito Partnership* v. *San Dieguito River Valley Regional etc. Authority* (1998) 61 Cal.App.4th 910, 920 [72 Cal.Rptr.2d 91].) Accordingly, we reverse the award of attorney fees and remand for a

redetermination. On remand, the trial court should begin its analysis with how much of plaintiffs' attorney fees should be properly allocated against Martin.[15]

### Costs

Code of Civil Procedure section 1032, not the subcontract, is controlling here. " 'Prevailing party' " is "the party with a net monetary recovery . . . ." (Code Civ. Proc., § 1032, subd. (a)(4).) As the prevailing party, plaintiffs were entitled to costs. The standard of review is abuse of discretion. (*Lubetzky* v. *Friedman* (1991) 228 Cal.App.3d 35, 39 [278 Cal.Rptr. 706].) Martin contends the court abused its discretion in awarding $11,560.40 in court reporter fees because plaintiffs were not entitled to these costs. Martin is mistaken. Recovery of "[c]ourt reporters fees as established by statute" is allowable. (Code Civ. Proc., § 1033.5, subd. (a)(11); Gov. Code, § 68086.) Martin also claims the court reporter fees should have been prorated. We agree for reasons explained in our discussion of plaintiffs' attorney fees. On remand, the trial court shall determine what amount of the court reporter fees should be allocated against Martin and adjust the cost award accordingly.

Martin claims it was an abuse of discretion to award plaintiffs 100 percent of the jury fees they incurred ($2,566.75) rather than a pro rata share. For reasons expressed above, we agree. On remand, the trial court shall determine what amount of the jury fees should be allocated against Martin and adjust the cost award accordingly.

Finally, plaintiffs sought and received $1,965.68 in exhibit and photocopying costs that were used to aid the trier of fact in connection with their case *against Martin*. Under Code of Civil Procedure section 1033.5, subdivision (a)(12), costs for "[m]odels and blowups of exhibits and photocopies of exhibits may be allowed if they were reasonably helpful to aid the trier of fact." Martin claims the court abused its discretion in awarding these costs because there was no showing the exhibits were actually used. Martin's reliance on *Evers* v. *Cornelson* (1984) 163 Cal.App.3d 310, 319 [209 Cal.Rptr. 497] is misplaced; that case dealt with an award of costs pursuant to Code of Civil Procedure section 998, not Code of Civil Procedure section 1032. Here, the trial court was aware of which exhibits were used and could determine if they were reasonably helpful to aid the trier of fact. There was no abuse of discretion. In any event, the court had the discretion under Code of Civil Procedure section 1033.5, subdivision (c)(2) to award the cost if it

---

[15]We note it would be appropriate for the court to request plaintiffs to submit their contingency fee agreement and consider that as the court sees fit in redetermining the attorney fees award.

found these exhibits and photocopies were "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation."

## C. Attorney Award for Posttrial Proceedings

In connection with posttrial proceedings, the trial court awarded plaintiffs $16,471.25 in attorney fees—half of the $32,942.50 sought by plaintiffs. Martin contends the award of any amount was an abuse of discretion because under the contingency fee arrangement between plaintiffs and their counsel, plaintiffs did not incur any of these fees. As we observed above (see pt. II.B, *ante*), it is appropriate to rely on billing statements, and a contingency fee agreement is but one factor a trial court may consider in awarding attorney fees. By cutting plaintiffs' request in half, the trial court clearly exercised its discretion in making the award for posttrial attorney fees.

### DISPOSITION

The judgments in favor of Signs, Torres and Mueller are affirmed in their entirety in No. D026292. Signs, Torres and Mueller are to recover their costs on appeal.

In the Martin appeal (No. D027470), the award of attorney fees to plaintiffs and costs associated with the trial is reversed and remanded to the trial court for redetermination in accordance with the views expressed in this opinion. In all other respects, the judgment is affirmed. The order awarding plaintiffs attorney fees for posttrial motions is affirmed. Plaintiffs and Martin are to bear their own costs on appeal.

Huffman, Acting P. J., and McIntyre, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied October 20, 1999. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.