[No. B151718. Second Dist., Div. Four. Dec. 5, 2002.]

MEL CLAYTON FORD, Plaintiff, Cross-defendant and Respondent, v. FORD MOTOR COMPANY, Defendant, Cross-complainant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IA, B, D and II.

**COUNSEL**

Crowe & Rogan, Patrick G. Rogan, Kate S. Lehrman and Robert A. Philipson for Defendant, Cross-complainant and Appellant.

Callahan, McCune & Willis and Peter M. Callahan for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**CURRY, J.**—Appellant Ford Motor Company appeals from a judgment on an express indemnity contract in favor of respondent Mel Clayton Ford (the Dealer). The parties were codefendants in an earlier lawsuit involving a third party seriously injured while driving a vehicle manufactured by Ford and sold and repaired by the Dealer. The parties entered into separate settlements of that lawsuit, and then commenced this action for indemnity. The trial court ruled that: (1) under the express terms of the agreement between the parties, Ford's obligation to defend the Dealer was broader than its obligation to indemnify; (2) even if the terms of the agreement could not be so construed, a broad duty to defend whenever the underlying lawsuit was potentially covered by the indemnification provision should be implied; (3) an indemnitee who settles a lawsuit after the indemnitor breaches its duty to defend and obtains a good faith determination under Code of Civil Procedure section 877.6, is entitled, without further proof, to recover its defense costs and the settlement amount from the indemnitor; (4) the Dealer could recover its defense costs and the settlement amount from Ford whether it paid these sums personally or they were paid by its liability insurer; and (5) a decision could be made concerning good faith settlement based on the allegations of the complaint alone, without review of the facts relating to the parties' respective liabilities known by the parties at the time of the settlement. The court was incorrect in these rulings, and we, therefore, reverse.

FACTUAL AND PROCEDURAL BACKGROUND

*Indemnity Clause of Parties' Agreement*

Ford and the Dealer entered into an agreement governing their relationship which included a separate indemnity provision. Among other things, Ford agreed to "defend, indemnify, hold harmless and protect the Dealer from any losses, damages or expense, including costs and attorney's fees, resulting from or related to lawsuits, complaints or claims commenced against the Dealer by third parties concerning: [¶] (1) . . . bodily injury or property damage arising out of an occurrence caused solely by a 'production defect' in that product (i.e., due to defective materials or workmanship utilized or performed at the factory), except for any 'production defect' in tires and diesel engines made by others, provided, however, that the 'production defect' could not have been discovered by the Dealer in the reasonable pre-delivery inspection of the VEHICLE, FOREIGN VEHICLE, TRUCK or HEAVY DUTY TRUCK (as applicable) as recommended by the Company. [¶] (2) . . . bodily injury or property damage arising out of an occurrence caused solely by a defect in the design of that product . . . ."

Ford further agreed that "[i]n the event that any legal action arising out of any of these causes is brought against the Dealer, [Ford] shall undertake, at its sole expense, to defend said action on behalf of the Dealer when requested to do so by the Dealer, provided that the Dealer promptly notifies [Ford] in writing of the commencement of the action against the Dealer and cooperates fully in the defense of the action in such manner and to such extent as [Ford] may reasonably require . . . . Should [Ford] refuse to undertake the defense on behalf of the Dealer, or fail to undertake an adequate defense, the Dealer may conduct its own defense and [Ford] shall be liable for the cost of such defense, including reasonable attorney's fees, together with any verdict, judgment or settlement paid by the Dealer (provided, however, that the Dealer shall notify [Ford] within a reasonable period of any such settlement)."

*Parker Action*

In May 1998, David Parker filed an action against Ford and the Dealer arising from an incident involving a 1989 Ford F250 truck purchased from the Dealer. The complaint alleged that Parker had been driving the truck on May 20, 1997, when it erupted into flames, seriously burning him. The complaint contained four causes of action. The first cause of action for strict product liability alleged that Ford and the Dealer "designed, manufactured, researched, tested, assembled, installed, marketed, advertised, distributed,

and sold" the truck, and that the truck was "defective in design, manufacture, assembly, materials selection, research and installation, based on the location and lack of integrity of the fuel system and all of its component parts, including but not limited to the mid-ship fuel tank, fuel tank structure and fuel lines." In the second cause of action for negligence, the complaint alleged that Ford and the Dealer breached a duty of care to "manufacture, assemble, design, test, research, market, advertise and distribute a vehicle free of defects." In the third cause of action, the complaint alleged that Ford and the Dealer breached a duty to warn "of the inherent danger embodied in said product, based on the lack of integrity of the fuel system and all of its component parts, including but not limited to the mid-ship fuel tank, fuel tank structure and fuel lines." The fourth cause of action for breach of warranty alleged that Ford and the Dealer expressly and impliedly warranted that their product was free from material defect, including defects in design, assembly, and manufacture.

In July 1999, the Dealer's attorneys sent a letter to Ford tendering the defense of the *Parker* matter. The letter stated: "[T]he plaintiff has sued the dealer . . . on passive negligence, 'stream of commerce' theories, as well as theories of direct or active negligence in the maintenance of the vehicle. We now know that the plaintiff has no evidence of any such active or direct negligence based on improper maintenance or anything else." The letter discussed the evidence which had come to light through discovery and otherwise. It noted that the Dealer had last worked on the truck's fuel pump 40 months and 20,000 miles previously. It discussed the possibility that a pin-sized hole located in the fuel filter, caused by either a defective product or corrosion, had led to a fuel leak that started the fire in the engine compartment. The plaintiff's experts had apparently theorized that a defect in the fuel tank led to an explosion or fireball in the passenger compartment.

Ford's response denied any obligation to defend or indemnify the Dealer. The letter from Ford's counsel stated: "[O]ur experts . . . identify the source of the fire as being in the area of the frame rail where [the Dealer's] mechanics did their work in the replacement of the high pressure fuel pump. This and other work which [the Dealer] performed, (including replacement of the frame rail mounted fuel filter) are all in the area where the fire apparently developed. Also, the catalytic converter and exhaust system had holes which should have been repaired by the dealership. Heat and flames from the exhaust could have set the spare tire on fire—another possible source of the fire initially seen by following motorists. Circumstantially, this indicates that something which the dealer did or failed to do later occasioned the fire." The letter demanded that the Dealer commit its insurance policy limits to settle the matter.

*Complaint and Cross-complaint Herein*

The parties settled with Parker in 1999. Ford paid $3.5 million. The Dealer paid $175,000. In November 1999, the Dealer brought a complaint against Ford for declaratory relief and breach of express indemnity contract. Ford cross-claimed for equitable indemnification, contribution, and declaratory relief.

*First Motion for Summary Adjudication*

The Dealer moved for summary judgment on the declaratory relief cause of action, seeking resolution of the issue of whether Ford had a duty to defend it in the *Parker* action. The Dealer's summary adjudication motion was based on five undisputed facts: (1) "[Ford] and [the Dealer] entered into a written agreement which contain[ed] a provision for [the Dealer's] defense and indemnity by [Ford]"; (2) "The Dealer Agreement requires [the Dealer] to tender its defense to [Ford] when sued for manufacturing or design defects"; (3) "[The Dealer] was sued for manufacturing and design defects"; (4) "[The Dealer] tendered its defense to [Ford]";[1] and (5) "[Ford] repeatedly refused to accept the tender of defense by [the Dealer]."

The Dealer argued that the issue presented did not require resolution of the cause of the accident. Citing a number of cases involving insurance companies and their insureds, the Dealer contended that " '[t]he existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit. [Citation.] Hence, the duty 'may exist even where coverage is in doubt and ultimately does not develop.' " (Quoting *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)

In its opposition, rather than disputing the facts put forth by the Dealer, Ford sought to establish additional facts, including that the *Parker* action did not arise solely out of a production defect or design defect; that the Dealer negligently serviced the vehicle; and that Ford was entitled to indemnification from the Dealer. Ford supported the allegations with testimony from experts that indicated there was no design defect in the vehicle, and that the source of the fire was the fuel pump or fuel filter which had been serviced by the Dealer or the muffler and exhaust system which had holes and leaks from rust and should have been replaced.

The court granted the motion for summary adjudication, finding that Ford had a duty to defend the Dealer in the *Parker* action. The court essentially

---

[1]The alleged tender was contained in the July 1999 letter quoted above.

interpreted the parties' agreement to require Ford to provide a defense whenever "at least one" of the contentions or claims the plaintiff is making is that the vehicle suffered from a design and/or manufacturing defect that was the sole cause of his or her injury. According to the court, "A complaint which espouses such a theory as one of the grounds for potential recovery is clearly a complaint or claim which 'is concerning' something 'caused solely by a design or other manufacturing defect.'" (Italics omitted.) It seemed to the court that "the three paragraphs of the indemnity agreement . . . read together are intended to tell the reader what the complaint or lawsuit must 'concern' before the duty to defend will attach, and that is the only reasonable reading of it—reasonable because it is when the complaint or lawsuit is made or filed that everyone must look to see what the duty to defend encompasses and whether or not the duty to defend which is the crux of this part of the agreement will attach, and that can be judged only by looking to what the complaint or lawsuit 'concerns,' not something to be determined in hindsight by what will someday ultimately be proven or not proven."

The court stressed that the contract before it was not "pure indemnification" but also included "a right of defense . . . ." The court expressed concern that a different interpretation "would mean that, Ford would never have a duty to defend—as opposed to possibly later indemnifying for the Dealer's costs of suit" since the court deemed it "highly unlikely that Ford will ever at the outset of litigation or early on admit . . . that everything was its fault . . . ." (Italics omitted.)

The court stated that although it did not have to reach this issue, "if called upon to so decide, the court would further determine that this is an adhesion contract and that it should and must be construed against its framer, Ford, where any ambiguities are concerned" and that "indemnification case law is not the sole body of law to look to here" because the contract was "like an insurance contract" in that it required the indemnitor (Ford) "to both defend and to later indemnify." The court further indicated that, although not sought by the Dealer in its motion for summary adjudication on the declaration relief cause of action, liability for the full amount of fees, costs, and settlement monies paid "would appear to follow this determination . . . ."

*Second Motion for Summary Adjudication/Summary Judgment*

Taking the court's advice, the Dealer filed a new motion for summary judgment or, in the alternative, summary adjudication, on the contract cause of action. In the statement of undisputed facts, the Dealer sought to establish that it had incurred $142,789.31 in attorney's fees in defense of the *Parker* action and $175,000 in settlement costs. Ford disputed that the Dealer had

incurred these costs, presenting evidence that the fees and the settlement had been paid by the Dealer's insurer. The court granted the motion for summary judgment, finding that the Dealer "presented substantial competent and undisputed evidence of [Ford's] wrongful refusal to defend [the Dealer] and competent and undisputed evidence of [the Dealer's] defense of the *Parker* action and the settlement incurred therein." The court ruled that even if the Dealer's insurer had paid for the defense and/or settlement, the result would be the same.

### *Third Motion for Summary Adjudication/Summary Judgment*

The Dealer next filed an application for determination of good faith settlement under Code of Civil Procedure section 877.6, subdivision (a)(2). The supporting declaration of Attorney Molly K. Zurflueh stated that Parker never alleged dealer negligence; that the Dealer "made an economic decision to buy its peace in the [*Parker*] matter [and] agreed to pay $175,000.00 to [Parker] in exchange for a release"; and that "[t]he aforementioned settlement was reached after discussions which were conducted at arms length." She further stated that "[t]he settlement [arose] out of no action of fraud and/or tortious conduct or conspiracy between this moving applicant and settling parties or any other parties in this action or the Parker action that would have the effect of injuring any of the non-settling parties as a result thereof." The court initially denied the motion on the ground that it lacked jurisdiction to make the finding requested, stating that the motion should have been made in the *Parker* action, but invited the Dealer to "file[] authorities to persuade the Court to the contrary . . . ." The Dealer submitted further briefing, bringing the case of *Regal Recovery Agency, Inc. v. Superior Court* (1989) 207 Cal.App.3d 693 [255 Cal.Rptr. 34], to the court's attention to support the position that the court had jurisdiction to decide the issue of good faith.

The Dealer then moved for summary judgment on Ford's cross-claim on the ground that the (expected) finding of good faith settlement precluded Ford from seeking equitable indemnity or contribution.

The court granted the motion for a finding of good faith settlement, stating that "[w]hile . . . $175,000 is not a large percentage of what Ford Motor settled for, . . . the complaint also alleges little to suggest that any negligent service on [the Dealer's] part caused the accident or that [Parker] believed that to be the case. Even [Ford's] 'experts' cannot now state that an inspection of the car showed that this accident was the dealer's fault—they offer nothing but 'maybes' and speculation in this regard."

The court also granted the motion for summary judgment on the cross-complaint on the ground that the good faith settlement barred any action for

equitable indemnity and the contract between Ford and the Dealer gave Ford no contractual right to obtain indemnification. Since this resolved all of the issues in the case, the court granted judgment for the Dealer in the amount of $351,342. Ford appealed.

## DISCUSSION

### I

"Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." (Civ. Code, § 2772.) "A collection of rules, developed primarily in insurance and construction cases, governs actions to enforce indemnity agreements. Paramount is the rule that '[w]here . . . the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity.' " (*Peter Culley & Associates v. Superior Court* (1992) 10 Cal.App.4th 1484, 1492 [13 Cal.Rptr.2d 624], quoting *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97].)

The burden of proof on an indemnitee (such as the Dealer) seeking to establish the liability of an indemnitor (such as Ford) under an express contract of indemnity where the indemnitee has settled the underlying claim is generally set forth as follows: "[W]hen the indemnitee settles without trial, . . . the indemnitee must show the liability is covered by the contract, that liability existed, and the extent thereof." (*Peter Culley & Associates v. Superior Court, supra,* 10 Cal.App.4th at p. 1497; accord, *Collins Development Co. v. D. J. Plastering, Inc.* (2000) 81 Cal.App.4th 771, 776 [97 Cal.Rptr.2d 83].)

The trial court did not require the Dealer to establish that the underlying liability was covered by the indemnity provision. Instead, the court concluded that the parties' agreement required Ford to defend the Dealer regardless of the Dealer's negligence whenever a claim for strict product liability was included in a complaint filed by a third party. It then awarded the Dealer the cost of the defense and settlement of the *Parker* action based on the belief that a failure to defend requires such amounts to be awarded automatically, as long as the indemnitee can establish that the settlement was in good faith. The court disregarded the evidence which showed that the Dealer's insurer paid the cost of the defense or the settlement.

As we will explain, the trial court misconstrued the liability of an indemnitor, and treated Ford *worse* than an insurer, applying a presumption that

does not make sense in this situation and requiring Ford to reimburse the Dealer for amounts that an insurer who breached a duty to defend would not have had to pay. Moreover, the court misinterpreted the parties' agreement. The indemnity provision required Ford to defend the Dealer only where the occurrence was caused *solely* by a production defect, and not whenever product liability was one of the allegations of the underlying complaint. We address the interpretation issue first.

A, B*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C

In *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775 [244 Cal.Rptr. 655, 750 P.2d 297], the Supreme Court acknowledged the rule that where an insurer breaches a contractual duty to defend and the insured settles the underlying lawsuit on its own behalf, a rebuttable evidentiary presumption arises: "In a later action against the insurer for reimbursement based on a breach of its contractual duty to defend the action, a reasonable settlement made by the insured to terminate the underlying claim against him may be used as presumptive evidence of *the insured's* liability on the underlying claim, and the amount of such liability. [Citations.]" (*Id.* at pp. 791-792, italics added.) According to the court, the presumption operates "where the insurer has wrongfully refused to cover or defend a claim, leaving the insured to mount his own defense or suffer a default. In order to recover reimbursement from the insurer, the insured must demonstrate that the claim was covered under the policy in question, or that the insurer breached its duty to defend. Once a breach of contract is proved, the insured's act of settling the claim is said to raise the presumption that the third party's claim against him was legitimate, and that he was liable in the amount which he agreed to pay in settlement. [Citation.]" (*Id.* at pp. 793-794.)[3]

These rules derive from statements of law first set forth in *Lamb v. Belt Casualty Co.* (1935) 3 Cal.App.2d 624, 631 [40 P.2d 311]. The insurer in *Lamb* had undisputedly committed breach of duty to defend. Complaints based on the alleged negligent operations of the insured's truck and the policy obligated the insurer to defend such actions. The court considered the

---

*See footnote, *ante*, page 46.

[3]It should be noted that *Isaacson* was not a failure to defend case. The insurer had allegedly breached its duty to accept a reasonable settlement offer, and the issue was whether the insurer should bear the burden of proving that a settlement offer within policy limits was unreasonable or whether the burden should be on the insured to prove that it was reasonable.

two potential outcomes of the underlying litigations and their ramifications on the liability of the insurer for breaching its duty to defend. If the underlying actions proceeded to trial, the court held, the insurer "is bound by the result of [the] litigation" provided it "had notice of the suit and an opportunity to control and manage it." (*Ibid.*) In other words, "[t]he judgment recovered in such a case is the mode by which *the insured proves to the insurer that the intrinsic character of the accident was such that he was liable for the consequences of it*, and the judgment is conclusive evidence that the insured was liable, and to the extent of the amount of the judgment. [Citations.]" (*Ibid.*, italics added.)

The rule was different if the underlying case settled: "[W]here there is no trial and no judgment establishing the liability of the insured, but a settlement of the litigation has been made, *the question whether the liability of the insured was one which the contract of insurance covered is still open, as is also the question as to the fact of liability and the extent thereof, and these questions may be litigated and determined in the action brought by the insured to recover the amount so paid in settlement.* The settlement, or a judgment rendered upon a stipulation of such a settlement, becomes presumptive evidence only of the liability of *the insured* and the amount thereof, which presumption is subject to being overcome by proof on the part of the insurer. [Citations.]" (*Lamb v. Belt Casualty Co., supra,* 3 Cal.App.2d at pp. 631-632, italics added.)

 As should be obvious, applying a presumption that *the indemnitee* is liable to the third party makes sense only in the situation where the indemnitor had agreed to compensate the indemnitee for the consequences of *the indemnitee's* own negligence. Unless rebutted, the presumption establishes that the indemnitee was truly liable on the underlying claim and did not pay the injured party as a volunteer. Such a presumption is not particularly helpful here, where Ford is *not* liable to indemnify the Dealer if the accident was caused by the Dealer's active negligence. Put another way, assuming a broad duty to defend could be read into the agreement and assuming Ford breached the duty, the Dealer would be entitled to a presumption that it was liable on the *Parker* claim. That presumption would not resolve the crucial question here: Whether the Dealer was passively negligent as a link in the chain of commerce on a product liability suit, or actively negligent for improperly making repairs on the vehicle. In the former case, Ford would be liable under the indemnity agreement; in the latter, it would not.

At least one recent appellate court has noted the error of attempting to apply the *Isaacson* presumption in a non-insurance context. In *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265 [87 Cal.Rptr.2d 497], a developer, J.M. Peters Company, Inc., settled with a class of homeowners by,

among other things, assigning its indemnification rights against nonsettling subcontractors. The agreement between the developer and certain of the subcontractors contained language providing that "the subcontractor 'agree[s] to indemnify and save [Peters] harmless against all claims for damages to persons or to property growing out of the execution of the work, and at his own expense to defend any suit or action brought against [Peters] founded upon the claim of such damage . . . .' " (*Id.* at p. 1278.) In a pretrial ruling, the trial court "[o]btained stipulations from the parties that Peters had tendered its defense in the underlying complaints to the subcontractors and received rejections." (*Id.* at p. 1274.) The plaintiffs in *Heppler* sought a jury instruction that "plaintiffs were entitled to a rebuttable evidentiary presumption that Peters [the developer] was liable for the amount it paid to settle the claims against it and the allocations of the good faith settlement were reasonable . . . ." (*Id.* at p. 1275.) The trial court refused that instruction, and instead ruled "that the indemnity provisions at issue did not apply unless plaintiffs proved the subcontractors were at fault." (*Ibid.*)

On appeal, the plaintiffs attacked the trial court's refusal to give the requested instruction and its "legal determination that subcontractor fault (negligence plus causation) was a prerequisite to trigger the contractual obligation to indemnify under [the] subcontracts . . . ." (*Heppler v. J.M. Peters Co., supra,* 73 Cal.App.4th at p. 1275.) The appellate court found no error, noting: "It appears what plaintiffs in fact wanted was an instruction that they were entitled to a rebuttable presumption that *nonsettling subcontractors*—not Peters—were liable for the amounts Peters paid to settle the claims. But the law does not so provide."[4] (*Heppler,* at p. 1282.)

The decision in *Heppler* has further significance here because the plaintiffs also sought a ruling that the trial court's earlier finding under Code of

---

[4]In reaching that conclusion, the court in *Heppler* stated: "Contrary to plaintiffs' contentions, these subcontractors, who promised to indemnify Peters against damages caused by their negligent work, did not assume the role of liability insurers. Liability insurers protect insureds against damage or liability from generally defined risks in exchange for a premium. [Citation.] Insurers have a distinct and free-standing duty to defend their insureds [citation] as opposed to indemnitors, whose duty to defend is not triggered until it is determined that the proceeding against the indemnitee is 'embraced by the indemnity.' (Civ. Code, § 2778, subd. 4 . . . .) Plaintiffs' reliance on a line of insurance coverage cases (e.g., *Isaacson* v. *California Ins. Guarantee Assn.*[, *supra,*] 44 Cal.3d 775 . . .) is misplaced." (*Heppler v. J.M. Peters Co., supra,* 73 Cal.App.4th at p. 1282.) That statement by the court creates the impression that had the litigants in *Heppler* been an insurance company and its insured rather than a developer and a group of subcontractors, the law would have granted the presumption of liability sought by the plaintiffs for breach of the duty to defend. In fact, as a comprehensive treatise on insurance law explained, it is by no means clear that "in cases where it turns out there was in fact *no coverage*, the insurer who wrongfully refused to defend a claim against its insured should be liable for: [¶] . . . [¶] a settlement negotiated by the insured in good faith, and free of fraud or collusion, in order to avoid the uncertainty of an adverse judgment in a greater amount." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 7:692.4, p. 7B-54, some italics omitted.)

Civil Procedure section 877.6 that the settlement between the developer and the homeowners was in good faith could be used to conclusively establish the amount owed by the subcontractors. The plaintiffs in *Heppler* appeared to believe—much as the Dealer does here—that the good faith finding could be used offensively to establish the amount due under a contract for indemnity. The trial court "refused to tell the jury the court had previously issued an order finding the settlement and allocations were in good faith," and ruled that "the only effect of the good faith settlement order would be to establish the allocations as the 'cap' of the indemnity obligation." (*Heppler v. J.M. Peters Co. supra,* 73 Cal.App.4th at p. 1274.)

The Court of Appeal agreed with the trial court. The plaintiffs' requested ruling had "blurred and confused the distinctions between good faith confirmation hearings, which address equitable indemnity issues, and proceedings to enforce contractual indemnity, where 'reasonableness,' does not equate with 'good faith.'" (*Heppler v. J.M. Peters Co. supra,* 73 Cal.App.4th at p. 1283.) "An adjudication that a settlement was made in 'good faith' under Code of Civil Procedure sections 877 and 877.6 bars cross-complaints against the settling parties and provides an offset to nonsettling tortfeasors against their remaining liability. [Citation.] Code of Civil Procedure section 877.6 allows a settling tortfeasor to insulate itself from contribution and equitable indemnity claims. [Citation.] Thus, these statutes provide a '*defensive*' procedure by which a joint tortfeasor may extricate itself from a lawsuit and bar actions for equitable indemnity by the remaining joint tortfeasors. [Citation.] [¶] The fundamental inquiry in a good faith hearing pursuant to Code of Civil Procedure sections 877 and 877.6 is whether the settling defendant is paying the plaintiff an amount that is so far below defendant's proportionate share of liability as to be completely ' "out of the ball park." ' (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 [213 Cal.Rptr. 256, 698 P.2d 159].) In an indemnity action, the crucial question is whether the settling indemnitee acted unreasonably by paying too much, thereby acting as a volunteer." (*Heppler v. J.M. Peters Co., supra,* 73 Cal.App.4th at pp. 1283-1284.) Because of these "crucial distinctions," the trial court's earlier finding under Code of Civil Procedure section 877.6 that the developer had settled in good faith "had no relevance in the indemnity trial" (*Heppler,* at p. 1284), and the appellate court was "not persuaded by plaintiffs' attempt to use the earlier good faith adjudication [of the settlement agreement] as a punitive 'hammer' . . . ." (*Id.* at pp. 1284-1285.)

In this regard, the court was following an earlier decision in *Peter Culley & Associates v. Superior Court, supra,* 10 Cal.App.4th 1484. There, an architectural firm sued a condominium developer to collect payments owed on the project. The developer cross-complained, alleging that design flaws

caused construction delays and increased costs. The developer and architectural firm settled the cross-complaint, and the architectural firm assigned to the developer its rights under an indemnity agreement with the structural engineer. The developer then brought an action to enforce the indemnity agreement against the structural engineer. The trial court entertained the developer's motion to determine whether the settlement between it and the architect was in good faith and, after so finding, determined that it was conclusive against the structural engineer. The court in *Peter Culley* rejected the notion that a trial judge can resolve the issues presented in a contractual indemnity case by way of a motion to determine the good faith of a settlement under Code of Civil Procedure section 877.6, and held that an indemnitee's right to contractual indemnity must be resolved by trial rather than by abbreviated proceedings. Noting that "Code of Civil Procedure section 877.6 provides a *defensive* procedure by which a settling joint tortfeasor or co-obligor may extricate itself from a lawsuit and bar actions for equitable indemnity by remaining joint tortfeasors or co-obligors" and that the case before it "illustrates some of the problems caused by blurring the distinction between the role of good faith in *defensive* section 877.6 proceedings and its role in *offensive* actions to enforce indemnity agreements," the Court of Appeal granted a writ directing the trial court to vacate its good faith settlement order and to conduct further proceedings. (*Peter Culley & Associates v. Superior Court, supra,* 10 Cal.App.4th at pp. 1488, fn. omitted, 1499.)

The developer in *Peter Culley* argued that a good faith settlement was conclusive based on language in Civil Code section 2778, which provides specific rules for the interpretation of an indemnity contract. Among other things, section 2778 provides: "4. The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity . . . ; [¶] 5. If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the latter suffered by him in good faith, is conclusive in his favor against the former." The court concluded that "insofar as Civil Code section 2778, subdivision 5 makes a 'recovery' suffered in good faith conclusive, the statute refers only to a recovery by judgment against the indemnitee. We also conclude the indemnification for either a recovery by judgment or a settlement presupposes that other contractual conditions for indemnity, such as the indemnitor's negligence, have been proven." (*Peter Culley & Associates v. Superior Court, supra,* 10 Cal.App.4th at pp. 1495-1496, fn. omitted.)

The holdings in *Heppler* and *Peter Culley* make clear that there are no shortcuts in this area. If the parties' agreement provides for indemnification

and defense only where the indemnitee is not negligent, then the indemnitee must prove through admissible evidence in the action for reimbursement that it was not negligent in the underlying matter, or was at most passively negligent. Tempting as it may be to rely on good faith motions and conclusive presumptions, they simply have no place where the indemnitee has never litigated the issue of negligence, and is seeking to use a prior settlement offensively to conclusively establish the amount owed by the indemnitor under an express indemnity contract.

### D*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed. The orders of September 15, 2000, and December 21, 2000, granting summary adjudication and summary judgment on the Dealer's complaint are reversed. The order of February 14, 2001, granting the Dealer's request for a finding of good faith is reversed. The order of June 6, 2001, granting the Dealer's motion for summary judgment on Ford's cross-complaint is reversed. The matter is remanded to the superior court for further proceedings consistent with this opinion. Ford is awarded its costs on appeal.

Vogel (C. S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied December 31, 2002, and respondent's petition for review by the Supreme Court was denied February 19, 2003.

---

*See footnote, *ante*, page 46.