[No. B160568. Second Dist., Div. Four. May 10, 2004.]

ALMA VALENTINE et al., Plaintiffs and Appellants, v.
MEMBRILA INSURANCE SERVICES, INC., Defendant and Appellant.

## COUNSEL

Haight, Brown & Bonesteel, Roy G. Weatherup, John W. Sheller, Frances O'Meara and J. Alan Warfield for Defendant and Appellant.

Biren/Katzman, Matthew B. F. Biren and Debra J. Tauger for Plaintiffs and Appellants.

OPINION

**CURRY, J.**—Appellants Jose and Teresa Martinez,[1] their corporation Martinez Enterprises, Inc. (jointly referred to herein as the Martinezes), and their assignee Alma Valentine appeal from a judgment rendered on their negligence claim against their insurance broker, Membrila Insurance Services, Inc. (Membrila). The comprehensive general liability (CGL) insurance policy procured by Membrila for the nightclub owned by the Martinezes contained a broad assault and battery exclusion. In 1998, Valentine was shot and seriously injured when leaving the nightclub and sued the Martinezes, a litigation that was resolved by a $6 million stipulated judgment containing a covenant not to execute. Appellants then brought suit against Membrila and the insurance company that issued the Martinezes' policy for breach of their respective duties. The insurer ultimately settled, and the matter proceeded to a bench trial as to Membrila only. The court found that Membrila had committed broker negligence, but awarded no damages due to offsets charged against the award.

Appellants contend that the trial court erred in ruling that Membrila's liability was limited to the $1 million in coverage that would have been available under the insurance policy but for the assault and battery exclusion, and that damages should instead have been set at $6 million, the amount of the stipulated judgment in the Valentine litigation. Appellants further argue that, even if the $1 million limitation applied, the court erred in offsetting the amount paid directly to Valentine by another defendant in the prior litigation. Membrila contends in its respondent's brief and cross-appeal that the $6 million figure in the stipulated judgment is irrelevant because the Martinezes were never legally determined to be liable to Valentine and, due to the covenant not to execute, sustained no loss as a result of the stipulated judgment. Separately, Membrila contends that substantial evidence did not support the trial court's finding of broker negligence.

Because we conclude that a stipulated judgment containing a covenant not to execute cannot create a presumption of liability or damages in a suit against a negligent broker, and damages were not otherwise established, we affirm the judgment of the trial court without reaching the other issues.

## FACTUAL AND PROCEDURAL BACKGROUND

*Valentine Litigation and Stipulated Judgment*

In the early morning hours of November 1, 1998, appellant Valentine was shot and rendered a paraplegic by a criminal assailant after leaving the Martinezes' nearby nightclub. The incident occurred in a parking lot owned

---

[1] Jose Martinez died while litigation was pending.

by the City of Los Angeles. Because the nightclub had only a few parking spaces of its own, patrons frequently used the City lot. The Martinezes had hired a private security firm, Metro Patrol Private Security (Metro Security), for the protection of patrons entering and leaving the nightclub. Shortly before the shooting, Valentine had gotten into her vehicle with two acquaintances, ready to depart, when her date approached and demanded that she get out. She acquiesced, and the two became involved in a noisy and protracted argument. The altercation spread to one of the passengers. Friends of the passenger or members of his family or gang intervened, one of whom drew and fired a handgun at Valentine and her date. The security guards apparently did not attempt to intervene at any time.

On May 7, 1999, Valentine brought suit against the Martinezes and Metro Security. With regard to the Martinezes, the amended complaint alleged that they were culpable under a theory of "premises negligence" in that they "negligently owned, occupied, maintained, managed and/or controlled said premises," "failed to take reasonable steps to make the premises safe," and "created an atmosphere inside the premises which cumulatively enhanced the probability of [their] patrons being injured" by, among other things, "provid[ing] inadequate security."

The Martinezes and Metro Security were both insured under CGL policies issued by Scottsdale Insurance Company (Scottsdale Insurance or Scottsdale). The policy insuring the Martinezes had been procured by their broker, respondent Membrila. Their policy contained a broad assault and battery exclusion, excluding coverage for negligence related to violent attacks, which provided in relevant part: "This insurance does not apply to Bodily Injury or Property Damage arising from: [¶] A. Assault and Battery committed by any insured, any employee of any insured, or any other person; [¶] B. The failure to suppress or prevent Assault and Battery by any person in A. above; or [¶] C. Any Assault and Battery resulting from or allegedly related to the negligent hiring, supervision or training or any employee of any insured."[2] Scottsdale agreed to defend Metro Security, whose policy contained no such exclusion, but not the Martinezes. The Martinezes retained counsel on their own. Counsel for the Martinezes sent numerous demands for defense to Scottsdale and, in each case, received a formal denial back.

Valentine settled with Metro Security for $925,000. Via a statutory demand, Valentine offered to settle with the Martinezes for $995,000. There is

---

[2] Membrila's letter to the Martinezes containing the quote offering the coverage contained a paragraph entitled "Exclusions" which listed the following items: "Care, custody & control, absolute pollution, asbestos, lead contamination, punitive damages, professional, medical payments, subsidence, employment related practices, known prior injury or damage, asbestos, nuclear energy, professional, assault & battery." The letter did not otherwise explain or mention the assault and battery exclusion.

no evidence in the record concerning whether the Martinezes formally responded to the demand or whether it was communicated to Scottsdale Insurance or Membrila. In any event, Valentine and the Martinezes thereafter agreed to a stipulated judgment of $6 million, plus interest. In the agreement, the Martinezes partially assigned to Valentine "their rights to sue Scottsdale Insurance Company and/or [Membrila] on a theory that the carrier breached its contract of insurance by failing to provide a defense to them and by failing to satisfy the stipulated judgment against [the Martinezes]."[3] The assignment was limited to the amount of the stipulated judgment and any interest that accrued. Beyond that, the Martinezes "reserve[d] to themselves the right to sue Scottsdale Insurance Company and/or [Membrila] for any other damages besides the judgement in favor of Valentine (financial or emotional) that they sustained as a result of the carrier's refusal to defend."

Valentine agreed not to execute or attempt to execute on the judgment on any asset of the Martinezes and to limit enforcement of the judgment to future litigation filed against Scottsdale Insurance and Membrila. Valentine further agreed that in the event the Martinezes pursued a lawsuit against Scottsdale Insurance or Membrila, "at the conclusion of any [such] litigation . . . regardless of the outcome of such litigation and regardless of the amount of money that might be collected by . . . Valentine, [Valentine] will provide [the Martinezes] with a full Satisfaction of Judgment."

The stipulated judgment was signed by the court, but never entered. The Martinezes incurred approximately $16,000 in attorney fees in defending the lawsuit.

### The Complaint Herein

After entering into the settlement, the Martinezes and Valentine (as assignee) brought suit against Scottsdale Insurance and Membrila. The claims against Scottsdale alleged that it violated its duty to defend, violated the covenant of good faith and fair dealing, and violated its fiduciary duty. The claims against Membrila alleged that, through its principal Frank Membrila, it had been the Martinezes insurance broker for many years; that the Martinezes relied on its >expertise and advice in connection with insurance matters; and that the Mar tinezes informed it of their need for a CGL policy. According to the complaint, Membrila negligently breached a duty of care owed to the Martinezes.[4]

---

[3] In response to a summary judgment motion by Membrila contending that the agreement did not assign any right to pursue it for claims of negligence, the stipulation was amended to reflect that such a claim was assigned.

[4] Two other claims for breach of fiduciary duty and negligent misrepresentation were dismissed prior to trial.

Scottsdale Insurance settled with appellants for $240,000, leaving Membrila as the sole defendant. Membrila moved for summary judgment, contending among other things that the Martinezes suffered no damage as a result of the alleged negligence because they incurred no actual obligation to Valentine. The court denied the motion. The parties agreed to a bench trial before a retired judge, which was held on February 20 and 21, 2002. In its trial brief, Membrila again argued that the Martinezes had suffered no damage due to the nature of the settlement with Valentine. Appellant insisted that the stipulated judgment established damages.

*The Trial Court's Judgment*

After hearing the evidence, the court agreed with appellants that Membrila had been negligent in procuring coverage for the Martinezes. Specifically, the court concluded that Membrila had "an affirmative duty to explain the extent of the assault and battery exclusion to his clients" due to "the long term relationship between [the parties], and given Mr. Membrila's knowledge of the Martinez business and his clients' concerns." In reaching this conclusion, the court discussed the factual dispute concerning whether a "standard" CGL policy would have contained the exclusion and noted that "[appellants'] expert . . . testified that Mr. Membrila had a duty to explain to Mrs. Rivera that the assault and battery exclusion would exclude coverage for negligent acts related to assault and battery."

The court further ruled that Membrila's liability would be limited to $1 million—the coverage limits under the Scottsdale Insurance policy—plus the costs of the Martinezes' defense of the Valentine suit. The court stressed that "this is not an insurance bad faith case or a breach of contract case" and cases cited by appellants dealing with insurance carriers "have no relevancy to the exposure of an insurance broker."

Appellants had apparently conceded that Membrila was entitled to a credit for the $240,000 settlement with Scottsdale Insurance. The court ruled that, in addition, the $925,000 Valentine received from Metro Security in settlement of her underlying personal injury claim should be offset against the $1 million plus $16,000 award, leaving a zero net recovery.

Appellants protested and sought clarification and reconsideration of the findings as to the offsets, but the court entered the judgment as set forth above. This appeal and cross-appeal followed.

## DISCUSSION

The trial in this matter was brief. The witnesses consisted of Glenda Rivera, the Martinezes' daughter, Frank Membrila, and both sides' insurance

experts. Rivera had dealt with Membrila on the Martinezes' behalf, and most of the questioning focused on establishing whether, based on their dealings, Membrila owed a duty of care to procure a policy with coverage for injuries to nightclub patrons arising from a criminal attack, or to explain to the Martinezes that the policy procured from Scottsdale Insurance contained no such coverage. Damages were relegated to a side issue, with appellants taking the position that the settlement between the Martinezes and Valentine was conclusive proof of the measure of damages suffered by the Martinezes and Membrila taking the position that it was a complete nullity. Consequently, there was no evidence offered on such issues as, the nature and amount of injuries suffered by Valentine, whether the Martinezes had defenses to Valentine's claims, or whether she was contributorily negligent.

Appellants relied on *Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500 [42 Cal.Rptr.2d 295] and *Xebec Development Partners, Ltd. v. National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501 [15 Cal.Rptr.2d 726] for the proposition that the stipulated judgment represented the measure of damages unless the defense established that the stipulated judgment was reached through fraudulent or collusive means. However, neither of these cases involved a suit against an insurance broker for negligence in procuring or explaining insurance, and their relevance to the present situation is the issue that must be addressed.

*Pruyn* and *Xebec* were essentially outgrowths of the Supreme Court's decision in *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775 [244 Cal.Rptr. 655, 750 P.2d 297]. There, the Supreme Court acknowledged the rule recognized in earlier decisions that if an insurance company " 'erroneously denies coverage and/or improperly refuses to defend the insured' in violation of its contractual duties, 'the insured is entitled to make a reasonable settlement of the claim in good faith and may then maintain an action against the insurer to recover the amount of the settlement.' " (*Id.* at p. 791, quoting *Clark v. Bellefonte Ins. Co.* (1980) 113 Cal.App.3d 326, 335 [169 Cal.Rptr. 832].) In addition, where the insurer wrongfully refuses to defend and the insured settles, the insured is entitled, in later litigation, to the following evidentiary presumption: "In a later action against the insurer for reimbursement based on a breach of its contractual duty to defend the action, a reasonable settlement made by the insured to terminate the underlying claim against him may be used as presumptive evidence of the insured's liability on the underlying claim, and the amount of such liability." (*Isaacson,* at p. 791.)

Earlier cases had held that where an insurance company breached its duty to defend and *judgment* was entered against the insured, even though entered as the result of default or an uncontested trial, the insurer would be bound by

its terms. This meant that to recover, the insured had only to prove breach of a duty to defend or that coverage existed under the policy. The prior judgment was considered *conclusive* on the issues of the liability of the insured to the injured third party and the amount of damages. (See, e.g., *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220 [178 Cal.Rptr. 343, 636 P.2d 32]; *Ford v. Providence Washington Ins. Co.* (1957) 151 Cal.App.2d 431, 436 [311 P.2d 930]; *Lamb v. Belt Casualty Co.* (1935) 3 Cal.App.2d 624, 631 [40 P.2d 311].) In other words, "[t]he judgment recovered [by the third party plaintiff] in [the prior] case is the mode by which the insured proves to the insurer that the intrinsic character of the accident was such that he was liable for the consequences of it, and the judgment is *conclusive evidence* that the insured was liable, and to the extent of the amount of the judgment." (*Lamb v. Belt Casualty Co.,* at p. 631, italics added.)

The court in *Isaacson* did not consider whether a settlement or stipulated judgment containing a covenant not to execute would raise a presumption of the insured's liability and the amount of such liability. *Pruyn* and *Xebec* addressed that issue. The court in *Xebec* held that such a settlement would not *conclusively bind* an insurer in a subsequent lawsuit as would a judgment entered after some type of court proceeding (contested or otherwise). It would, however, be given presumptive weight, as set forth in *Isaacson*. (*Xebec Development Partners, Ltd. v. National Union Fire Ins. Co., supra,* 12 Cal.App.4th at pp. 544–545.) Thus, to establish liability, "the proponent of the presumption [would bear] the burden of proving by a preponderance of the evidence the *basic* or *foundational* facts that the settlement (1) was occasioned by a breach of the insurance contract by [the insurer], (2) was *valid* with respect to [the insurer], and (3) was *reasonable* in the sense that it reflected an informed and good faith effort by the settling parties to reconcile their presumably differing views as to the relative strengths of their respective claims and defenses." (*Id.* at p. 545.) The court further held that the presumption was properly classified as one affecting the burden of proof. (*Id.* at p. 549.) This meant that, once the foundational facts were laid down, the insurer would be required "to persuade the jury, by a preponderance of the evidence, that the settlement did not accurately reflect the fact or amount of liability. Rebuttal evidence sufficient to support a finding that the presumed fact does not exist would not cause the presumption to disappear: It would be for the jury, if it found the basic or foundational facts, then to decide whether it was persuaded by the opponent's rebuttal evidence." (*Id.* at p. 546.)

The court in *Pruyn* agreed, specifically holding: "[Where] a liability insurer wrongfully denies coverage or refuses to provide a defense, then the insured is free to negotiate the best possible settlement consistent with his or her interests, including a stipulated judgment accompanied by a covenant not to execute. Such a settlement will raise an evidentiary presumption in favor of the insured (or the insured's assignee) with respect to the existence and

amount of the insured's liability. The effect of such presumption is to shift the burden of proof to the insurer to prove that the settlement was unreasonable or the product of fraud or collusion. If the insurer is unable to meet that burden of proof then the stipulated judgment will be binding on the insurer . . . ." (*Pruyn v. Agricultural Ins. Co., supra,* 36 Cal.App.4th at p. 509.)

The court in *Pruyn* recognized that "a stipulated or consent judgment which is coupled with a covenant not to execute against the insured brings with it a high potential for fraud or collusion." (*Pruyn v. Agricultural Ins. Co., supra,* 36 Cal.App.4th at p. 518.) " 'With no personal exposure the insured has no incentive to contest liability or damages. To the contrary, the insured's best interests are served by agreeing to damages in any amount as long as the agreement requires the insured will not be personally responsible for those damages.' " (*Ibid.,* quoting *Wright v. Fireman's Fund Ins. Companies* (1992) 11 Cal.App.4th 998, 1023 [14 Cal.Rptr.2d 588].) Nevertheless, the court specifically disagreed with the holding in *Smith v. State Farm Mut. Auto. Ins. Co.* (1992) 5 Cal.App.4th 1104 [7 Cal.Rptr.2d 131], that a stipulated judgment containing a covenant not to compete did not represent a recovery against the insured and therefore could not bind the insurer due to the danger of "collusion and the bootstrapping of unsupportable damage claims well in excess of policy limits." (*Pruyn v. Agricultural Ins. Co., supra,* 36 Cal.App.4th at p. 519.) The court in *Pruyn* reasoned that the risk of collusion and inflation of claims was acceptable given that "*the presumption only arises in those cases where the insurer has breached the underlying insurance contract*" and that "[i]n no other way can the courts give any meaningful protection to an insured who is abandoned by a liability insurer *wrongfully denying coverage or refusing a defense* and at the same time provide to the insurer some measure of procedural due process in order to protect against the consequences of a fraudulent or collusive settlement." (*Id.* at p. 530, italics added.)

The courts in *Isaacson, Pruyn,* and *Xebec* all expressly limited their holdings to litigation between an insurance company and its policyholder. Appellants are critical of Membrila for citing no authority for its position that the stipulated judgment had no evidentiary weight, but neither do they present authority for their view that the presumption has a place in a broker negligence claim. Nor have we located authority directly on point, although courts have agreed that, in general, " ' "[t]he liability of one who breaches a contract to procure insurance . . . is not that of an insurer." ' " (*Delta Manufacturing Co. v. Jones* (1977) 69 Cal.App.3d 428, 432 [138 Cal.Rptr. 40], italics omitted; accord, *Mid-Century Ins. Co. v. Hutsel* (1970) 10 Cal.App.3d 1065, 1069 [89 Cal.Rptr. 421]; see also *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 576 [108 Cal.Rptr. 480, 510 P.2d 1032] [holding that agents of an insurer, such as its adjusting firm and lawyers, could not be sued for bad faith breach of the duty of good faith and fair dealing implied in

every insurance contract because: "[T]he non-insurer defendants were not parties to the agreements for insurance; therefore, they are not, as such, subject to an implied duty of good faith and fair dealing"].) Moreover, courts have consistently rejected attempts to expand the applicability of the presumption in other ways.

In *Hamilton v. Maryland Casualty Co.* (2002) 27 Cal.4th 718 [117 Cal.Rptr.2d 318, 41 P.3d 128], for example, the court expressed agreement with the holdings in *Xebec* and *Pruyn*, stating that in the case of an insurer's wrongful refusal to defend, the policyholder is entitled "to make a reasonable, noncollusive settlement without the insurer's consent and to seek reimbursement for the settlement amount in an action for breach of the covenant of good faith and fair dealing" and that " ' "[w]here the insurer has repudiated its obligation to defend[,] a defendant in the absence of fraud may, without forfeiture of his right to indemnity, settle with the plaintiff upon the best terms possible, taking a covenant not to execute" ' " and then assign its action against the insurer for breach of its defenses duties to the third party plaintiff. (*Id.* at p. 728, quoting *Samson v. Transamerica Ins. Co., supra,* 30 Cal.3d at p. 240.)

But the insurer in *Hamilton* had been providing a defense. A falling out occurred when the insurer rejected a settlement offer within policy limits and decided to proceed to trial. Fearing that a claim in excess of policy limits was a likely outcome, the insured agreed on its own to a stipulated judgment in the amount of $3 million (three times policy limits), and assigned its claims against the insurer to the injured third party in return for a covenant not to execute. In the subsequent suit against the insurer, the trial court entered judgment based on the amount of the stipulated judgment. The issue before the court in *Hamilton* was whether "a stipulated judgment coupled with a covenant not to execute against the insured . . . may be treated as a presumptive measure of the damages the policyholder has suffered as a result of the insurer's breach of contract." (*Hamilton v. Maryland Casualty Co., supra,* 27 Cal.4th at p. 725, italics omitted.)

Initially, the court noted that "[n]o decision we have found holds that a stipulated judgment in excess of the policy limits, for which the insured is relieved from personal liability by a covenant not to execute, may be deemed even a presumptive determination of the insured's damages in an action against a defending insurer for breach of its settlement duty." (*Hamilton v. Maryland Casualty Co., supra,* 27 Cal.4th at p. 733.) The plaintiffs argued that "a stipulated judgment, despite the covenant not to execute, [should create] a rebuttable presumption of the insured's damages, at least where it has been confirmed as reached in good faith pursuant to Code of Civil Procedure section 877.6." (*Id.* at pp. 725–726.) The court disagreed:

"[W]here the insurer has accepted defense of the action, *no trial has been held to determine the insured's liability, and a covenant not to execute excuses the insured from bearing any actual liability from the stipulated judgment*, the entry of a stipulated judgment is insufficient to show, *even rebuttably*, that the insured has been injured to any extent by the failure to settle, much less in the amount of the stipulated judgment. In these circumstances, the judgment provides no reliable basis to establish damages resulting from a refusal to settle, an essential element of plaintiffs' cause of action." (*Id.* at p. 726, italics added.)

Plaintiffs in *Hamilton* attempted to persuade the court by contending that insurer would be protected against unfair inflation in the stipulated judgment by the ability to litigate in the bad faith action both its own breach and the amount of the policyholder's damages. The court responded: "[If] plaintiffs envision litigating the reasonableness of the stipulated judgment, . . . *reasonableness of the stipulated figure is insufficient to show the insured's damages where the insured, by agreement with the claimant, does not bear any actual liability for the stipulated figure*." (*Hamilton v. Maryland Casualty Co., supra*, 27 Cal.4th at p. 734, italics added.)

Attempts to use settlements as binding or presumptive evidence of damages outside the context of an insurer/insured relationship were rejected in *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265 [87 Cal.Rptr.2d 497], and *Peter Culley & Associates v. Superior Court* (1992) 10 Cal.App.4th 1484 [13 Cal.Rptr.2d 624], both of which involved construction defects and express indemnity contracts—even though the settlements in those cases involved actual payment of funds to the injured third parties. Instead, the courts applied the rule applicable to noninsurance indemnity agreements: "[W]hen the indemnitee settles without trial . . . the indemnitee must show the liability is covered by the contract, that liability existed, and the extent thereof." (*Peter Culley & Associates v. Superior Court, supra*, 10 Cal.App.4th at p. 1497; see *Heppler v. J.M. Peters Co., supra*, 73 Cal.App.4th at pp. 1283–1284 [in rejecting the contention that a settlement made in good faith could be used offensively to establish the amount due under a contract for indemnity, the court said: "In an indemnity action, the crucial question is whether the settling indemnitee acted unreasonably by paying too much, thereby acting as volunteer"].)

This court rejected a similar attempt to use a settlement offensively against a potential indemnitor in *Mel Clayton Ford v. Ford Motor Co.* (2002) 104 Cal.App.4th 46 [127 Cal.Rptr.2d 759]. There, an automobile dealer sought indemnification under an express contract with a manufacturer. The trial court ruled that because the dealer settled after the manufacturer breached its duty to defend, and obtained a good faith settlement determination, the dealer was

entitled to recover its defense costs and the settlement amount from the manufacturer without further proof of liability or damage. We reversed, warning against the general application of legal principles developed for litigation between insurance companies and policyholders. No other relationship is truly analogous, and attempts to borrow rules that work well when an insurer is the defendant could result in unfairness in other situations. In *Mel Clayton Ford*, for example, the trial court's attempt to apply the presumption set forth in *Xebec* and *Pruyn*, precluded the defendant manufacturer from raising valid defenses, including the dealer's negligence and the fact that the so-called damages, including defense costs, had actually been paid by the dealer's insurer. (See *Mel Clayton Ford v. Ford Motor Co., supra*, 104 Cal.App.4th at pp. 51–53.)

Our review of the authorities convinces us that it would be equally unfair to apply the *Xebec/Pruyn* presumption of correctness with regard to a stipulated judgment in a case against an insurance broker for negligence in procuring or explaining a policy. Appellants imply that it is merely a matter of the broker stepping into the shoes of its theoretical insurer (i.e., the one that would have issued a CGL policy without the assault and battery exclusion, in this case) and assuming the insurer's liability for the failure to defend. But the concepts governing an insurance company's duty to defend are not easily transferred to a case involving alleged broker negligence. It is well understood, for example, that an insurer's duty does not arise until defense is tendered by the insured and the known facts point to a potential for liability under the policy. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 7:515, p. 7B-6; *id.*, ¶ 7:604, p. 7B-28.) The facts needed to make the determination are relatively easy to assemble: the language of the policy, and the nature of the allegations in the claims brought against the insured.

We can conceive of no similar logical point at which to charge an allegedly negligent broker with knowledge that a duty to defend had arisen. In this case, for example, there was no tender of the Martinezes' defense in the Valentine litigation to *Membrila*. Instead, Membrila was informed that Scottsdale Insurance had refused tender, but what was it to make of this fact? Where an insurance company refuses to defend based on the language of the policy, a court may later interpret the policy differently and conclude that there was at least a potential for coverage. Even if the wording of the policy is found to unambiguously exclude the injury, inadequate coverage may or may not be the result of the broker's negligence. Membrila testified that he had sold dozens of CGL policies containing an assault and battery exclusion similar to the one at issue here, and that they represented the only CGL policies he had procured in the five-year period prior to 1998. The trial court was persuaded by the testimony of appellants' expert that a reasonable broker would have explained the assault and battery exclusion to his or her client

(rather than simply supplying them with a copy) because it differed from a "standard" CGL policy of which Membrila was apparently unaware. On these facts, it is impossible to say when Membrila's theoretical duty to defend would have arisen.

This is important because, as we have seen, the justification given for evidentiary use of settlements and stipulated judgments containing covenants not to execute notwithstanding their high risk of fraud and collusion is that the insurer behaved egregiously in "abandon[ing]" the insured and "wrongfully denying coverage or refusing a defense." (*Pruyn v. Agricultural Ins. Co., supra,* 36 Cal.App.4th at p. 530.) We cannot say that Membrila behaved in a similarly blameworthy fashion here.

■ More importantly, special duties are imposed on insurers because of the unequal bargaining strength of the parties in the relationship. As stated in the landmark decision of *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], where the broad duty to defend was first recognized: "[T]he individual consumer in the highly organized and integrated society of today must necessarily rely upon institutions devoted to the public service to perform the basic functions which they undertake. At the same time the consumer does not occupy a sufficiently strong economic position to bargain with such institutions as to specific clauses of their contracts of performance, and, in any event, piecemeal negotiation would sacrifice the advantage of uniformity. Hence the courts in the field of insurance contracts have tended to require that the insurer render the basic insurance protection which it has held out to the insured." (*Id.* at p. 280.) The same cannot be said of the relative bargaining strength between a broker and its clients. In the specialized area of commercial insurance, the client may be more knowledgeable and sophisticated than the broker.

Appellants take the position that this type of analysis is unnecessary because, as a tortfeasor, Membrila is required to pay all consequential damages that flowed from its negligence which, appellants believe, include the possibility that the theoretical insurer might have refused a reasonable offer within policy limits, and then become liable for the full amount of any resulting judgment in excess of policy limits. This is incorrect. The proper method of calculating liability for professional negligence is set forth in *Loube v. Loube* (1998) 64 Cal.App.4th 421 [74 Cal.Rptr.2d 906]. There, attorneys had filed a lawsuit on behalf of their clients. The defendants did not answer, and following a default prove-up the court awarded $248,102 in compensatory damages, plus $200,000 in punitive damages and attorney fees and costs. The defendants filed a motion for relief from default, which the court denied, but, in so doing, reduced damages to $25,000—the jurisdictional minimum of the court—because no specific amount of compensatory

damages had been pled in the original complaint. The clients then sued their attorneys for malpractice. When the matter was litigated, the court conducted a "trial within a trial" and concluded that the clients should have received approximately $12,000 from the original defendants, and no punitive damages, and that therefore they suffered no actual loss. On appeal, the clients insisted that they were damaged because, but for the negligence of the attorneys in failing to set forth an amount in the original complaint, they would have received an additional $223,000.

The court disabused them of the notion that the legal system exists to assist parties in obtaining windfalls: "In order to recover on a theory of professional negligence, it is not enough to show that the defendant breached a duty owed to the client; the client also must demonstrate that the breach of that duty caused actual loss or damages." (*Loube v. Loube, supra*, 64 Cal.App.4th at p. 425.) The court's analysis as to why no damages existed is highly relevant to the present situation, and so we quote it at length:

"First, it is anything but certain that, absent the alleged negligence, appellants would have received a default judgment awarding each of them $248,102 compensatory damages. For that to have occurred respondents would have had to have stated sums in the complaint equal to or greater than $248,102, [the original defendants] would have had to have failed to respond to the complaint notwithstanding the statement of such sums and, assuming default was taken, the court ruling on a motion for relief from default would have had to deny relief in its entirety. It thus is no more than speculation that appellants would have obtained a judgment of $248,102 but for the alleged negligence of respondents. Speculative damages are not damages supporting an action for professional negligence. [Citation.]

"Second, an award of damages that exceeds actual loss runs afoul of the basic principle that damages are awarded to compensate for loss incurred. A client who has been made whole—from whatever source—thus may not maintain an action for professional negligence against her former attorney. [Citation.] It is undisputed here that appellants were more than made whole by the award of $25,000 compensatory damages and $200,000 punitive damages.

"Finally, we cannot endorse a rule that determines liability by measuring the amount that a client *might* have received in connection with a claim, rather than the actual value of the claim. . . . The question is not what *might* or even what *would* have happened absent the alleged malpractice, but what *should* have happened. . . . [¶] . . . The original award of $248,102 compensatory damages is not what *should* have happened, even if it is what *would* have happened if respondents had alleged a specific sum of damages in

the complaint. That [the original defendants] failed to answer was fortuitous, and as was demonstrated by the proceedings here, a just award of damages did not result. The just result could not be determined unless and until appellants' claims were fully litigated. Stated another way, the damages must be measured by the actual value of the claim and not by the possibility that a judgment more favorable to appellants might have been obtained. A plaintiff who in fact has been made whole is entitled to no more. [¶] *In so finding we necessarily reject the argument that the trial court erred in compelling appellants actually to litigate their claim, rather than accepting the uncontested amounts accepted at the prove-up hearings. Those amounts were relevant only to what might have been awarded and are not particularly relevant to what should have been awarded; i.e., the value of appellants' claim.*" (*Loube v. Loube, supra,* 64 Cal.App.4th at pp. 426–427, last italics added.)

■  Like the court in *Loube,* we are unmoved by the claim that the stipulated judgment established that the Martinezes suffered significant unreimbursed damages due to Membrila's alleged negligence. Accepting the trial court's conclusion that Membrila breached its duty of care means the Martinezes should have had an insurer ready to step in and defend them in the Valentine litigation. Their costs of defense are a clear loss, as the trial court held—but a loss for which the settlement with Scottsdale Insurance more than reimbursed them. Beyond that, all that can be said is that perhaps there *should have been* a judgment in some amount against them for their share of liability to Valentine. But there was no trial in the Valentine litigation, and appellants made no attempt at the trial herein to prove what that amount *should have been.* The settlement, since it included a covenant not to execute and thereby excused the Martinezes from bearing any actual liability to Valentine, provided no reliable basis to establish damages. (See *Hamilton, supra,* 27 Cal.4th at p. 726.) There was no other evidence offered. Accordingly, recoverable damages were limited to the $16,000 in defense costs incurred. Applying a $240,000 offset to that amount, leaves a net recovery of zero.

## DISPOSITION

The judgment is affirmed. The cross-appeal is deemed moot. Respondent Membrila recovers costs on appeal.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied May 28, 2004, and the petition of plaintiffs and appellants for review by the Supreme Court was denied July 28, 2004.