Filed 3/27/13  Spyksma v. Sousamian CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHRISTINE SPYKSMA, | |
| Plaintiff and Respondent, | G046837 |
| v. | (Super. Ct. No. 30-2010-00430100) |
| TIMOTHY SOUSAMIAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Thierry Patrick Colaw, Judge.  Affirmed.

Kenneth D. Sisco for Defendant and Appellant.

Greenbaum Law Group and Brooke A. Brandt for Plaintiff and Respondent.

\*          \*          \*

Timothy Sousamian appeals from a judgment holding him liable to Christine Spyksma under a "hold harmless" clause in the asset separation agreement entered into between the parties. Sousamian contends Spyksma's $45,000 payment to a lender to obtain a release of her liability for a loan following Sousamian's default was "voluntary" and thus it did not trigger his obligation to indemnify her under the hold harmless clause. We disagree and affirm the judgment.

Sousamian errs by conflating the amount identified as *past due* in the lender's notice of default ($10,815.80) with the amount the lender *claimed was owed as a consequence of that default.* According to the notice, the lender's claim was for "all sums secured []by" the deed of trust, which it had elected to "declare . . . immediately due and payable" as a consequence of Sousamian's default. It was *that claim*, amounting to approximately $270,000, Spyksma was responding to when she negotiated her peace with the lender. Her payment of $45,000 to achieve that peace cannot, therefore, be considered "voluntary."

FACTS

In March of 2008, Sousamian and Spyksma entered into an agreement to divide their joint ownership of various assets and liabilities. Included among the assets were a "motor home coach" (the coach) and "[a] lot at 'Outdoor Resorts' in Indio on which the [c]oach is from time to time parked . . . ." (The coach lot.) The agreement reflected the parties had jointly obtained one loan to purchase the coach and a separate loan in the amount of $275,000 to purchase the coach lot. Spyksma agreed to convey her interest in both the coach and the coach lot to Sousamian, and he in turn agreed to assume exclusive responsibility for both loans. He further agreed to "hold [her] harmless from

2

any claims from the lender on the coach loan, the lender on the coach lot loan, the association associated with the coach lot, and other creditors associated with the coach, the coach lot, or the coach lot loan." (Capitalization omitted.)

By 2010, Sousamian was experiencing significant financial difficulties. He sold the coach, and attempted without success to sell the coach lot. He made his last payment on the coach lot loan in June 2010. He did not inform Spyskma of his default, however. Instead, in September 2010, Spyksma received notice from the lender that the coach lot loan was in default.

Specifically, the lender's default notice stated that $10,815.80 was the amount of "pastdue payments plus permitted costs and expenses," on the loan as of September 1, 2010, and that the amount "will increase until your account becomes current." The notice explained "you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account," but goes on to state that the bank "has declared and does hereby declare all sums secured . . . [by the Deed of Trust] immediately due and payable . . . ."

After receiving that notice, Spyksma contacted Sousamian, who informed her he had no intention of making further payments on the loan, and would allow the loan to go into foreclosure without making any attempt to cure the default. Spyskma then contacted the lender, explained the terms of her agreement with Sousamian, and inquired whether it would be possible to release her from liability on the loan. The representative of the lender informed her it would not agree to release her without consideration.

After some negotiation, Spyksma agreed to pay the lender $45,000 in exchange for its release of her liability on the coach lot loan and its agreement "not [to] report any nonpublic information to credit reporting agencies pertaining to the [l]oan."

At the time of Spyskma's agreement with the lender, the principal balance on the loan was "$240,115.20, exclusive of interest, late fees and legal fees."

Spyksma demanded Sousamian send her the $45,000 to pay the lender, but he refused. She thereafter paid the lender from her own funds and filed suit against him to recoup that payment.

After a trial at which both parties testified, the court ruled in favor of Spyksma. The court found "[t]here are no bad people in this lawsuit," and recognized Sousamian "had financial difficulties that were not necessarily his fault, but they were the reality of the situation. He could not make payments." The court explicitly inferred from the lender's notices in evidence that "the entire [loan] amount is due and owing if you default." Spyksma, concerned about the effect on her credit rating, then "tried to buy her piece [sic: 'peace'] on this $270,000 debt. She bought it for $45,000. She incurred the debt . . . and the claim because the primary payor, [Sousamian], didn't pay, and [he] was not able to honor the agreement that he had with her." Although the court acknowledged Sousamian might have made a different decision if he had been in Spyksma's situation, it reasoned "it was her call to make because she was left with the debt [after Sousamian] walked away . . . . It is a claim. It does trigger the operable clause of the agreement."

DISCUSSION

A "hold harmless" clause is a form of indemnity agreement. "The very essence of an indemnity agreement is that one party hold the other harmless from losses resulting from certain specified circumstances." (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 973.) "[I]ndemnity refers to 'the obligation resting on one party to make good a loss or damage another party has

4

incurred.'"  (*Prince v. Pacific Gas & Elec. Co.* (2009) 45 Cal.4th 1151, 1157.)

Sousamian's appeal is primarily grounded on the assertion Spyksma's $45,000 payment to the lender qualified as *voluntary*, because it was made for the purpose of protecting her own credit rating and not in response to the compulsion of an existing "legal liability."  (*Southern Cal. Gas Co. v. Ventura etc. Co.* (1957) 150 Cal.App.2d 253, 257.)  He claims that such a "voluntary" payment would not trigger his obligation to indemnify Spyskma under the hold harmless clause.  The assertion is flawed both legally and factually.

First, the prohibition against indemnity for "voluntary" payments is not as plenary as Sousamian suggests.  While "[a]s a general rule, an indemnity contract does not cover losses for which the indemnitee is not liable to a third person or for which the indemnitee improperly pays" (*Peter Culley & Associates v. Superior Court* (1992) 10 Cal.App.4th 1484, 1493), it is also true that "'*one acting in good faith in making payment under a reasonable belief that it is necessary to his [her] protection is entitled to indemnity or subrogation, even though it develops that he [she] in fact had no interest to protect*. [Citation.]' [Citation.]"  (*Ibid*., italics added.)  Thus, even if it were ultimately established that Spyskma was not liable on the coach loan, or that her potential liability was more limited than she understood when she negotiated her settlement, indemnity would still be appropriate as long as Spyksma acted reasonably and in good faith in doing so.  But Sousamian has made no attempt to establish that Spyksma's settlement, even if unnecessary to protect her bank account, was not based upon a *reasonable belief* that it was necessary for her financial protection.  Nor has he made any effort to portray her as having acted in bad faith.  He has consequently failed to demonstrate that indemnity was legally inappropriate.

And even if we agreed with Sousamian's characterization of the law, his argument would founder on the facts.  His key factual assertion is that at the time

5

Spyksma agreed to pay the $45,000, the only "claim made by the lender" was for immediate payment of $10,815.80 – the amount of "arrears necessary to get the property and loan out of default." Based on that factual assertion, he argues Spyksma's agreement to pay an amount significantly in excess of that claim must be viewed as "voluntary." But the assertion is incorrect. As the trial court explicitly found, the lender's notices reflected its claim that, as a result of Sousamian's default, the *entire loan balance* was "due and owing . . . ."

As Spyksma points out, Sousamian simply ignored that crucial factual finding in his opening brief. Moreover, his belated effort to "dispute[]" the finding in his reply brief is ineffective. Sousamian rests his effort on the notice of default dated September 2, 2010, which he claims states that $10,815.80 was the amount "due and payable" as of that date. It does not. What the notice states is that $10,815.80 is the amount of "past due payments plus permitted costs and expenses," as of September 1, 2010, and that the amount "will increase until your account becomes current." The notice then goes on to specify the bank "has declared and does hereby declare all sums secured . . . [by the Deed of Trust] *immediately due and payable . . . .*" (Italics added.) Thus, contrary to Sousamian's contention, what this notice unequivocally establishes is that the lender's *claim* was for immediate payment of the entire loan balance.

Moreover, the fact the lender might have agreed to accept a smaller payment to cure the default and reinstate the loan is of no consequence. As between these parties, Spyksma had no obligation to make the loan payments; the parties' agreement had assigned that obligation to Sousamian alone. And curing the default would have offered only a temporary reprieve in any event, since Sousamian expressly informed Spyksma he *had no intention of making any further loan payments.* She was entitled to rely on his statement and to proceed on the understanding she had only two

6

options:  (1) voluntarily cure his default and then continue making the monthly payments *until the end of the loan term*; or (2) accept his default and negotiate a permanent resolution of the bank's claim for immediate payment of the entire loan amount.  As we have already noted, she owed him no obligation to do the former.

Sousamian also suggests Spyksma's payment of $45,000 should be considered voluntary because her liability to the lender would necessarily have been "extinguished" as part of the non-judicial foreclosure process ultimately utilized by the lender in connection with the coach lot.  But Sousamian's assertion concerning the ultimate disposition of the property is unsupported by any citation to the record and we consequently disregard it.  Besides, the manner in which the property was *later* disposed of would not be determinative of Spyksma's liability at the time she entered into her settlement agreement with the lender and triggered Sousamian's duty to indemnify.  She was clearly *liable* for the principal loan amount at that point, and the lender could have chosen to enforce the debt in a judicial proceeding.  In any event, the assertion reflects confusion between the concepts of *liability* and *collectability*.  While a non-judicial foreclosure process does extinguish *liens* and prevent the lender from obtaining a deficiency *judgment* (Code of Civ. Proc. § 580, subd.(d); *Cadelrock Joint Venture, L.P. v. Lobel* (2012) 206 Cal.App.4th 1531), it does not automatically nullify the obligor's *liability* to pay the debt in accordance with the loan agreement.  "Although the lender may not obtain a deficiency judgment after a foreclosure by power of sale (Code Civ. Proc., § 580, subd. (d)), the foreclosure does not extinguish the debt.  The lender retains other remedies for collection of the unpaid balance of the debt." (*Romo v. Stewart Title of California* (1995) 35 Cal.App.4th 1609, 1615, fn.5; *Hatch v. Security-First Nat. Bank.* (1942) 19 Cal.2d 254, 258.)

Finally, even assuming the lender would never have made any attempt to collect a deficiency from Spyksma following foreclosure on the coach lot, we nonetheless reject Sousamian's implication that her payment of $45,000 to the lender was excessive. "The ultimate determination of whether or not indemnity should be allowed . . . is generally a factual question" (*Aetna Life & Cas. Co. v. Ford Motor Co.* (1975) 50 Cal.App.3d 49, 53), and "even if the indemnitor is not bound by the amount of damages arrived at as part of a settlement, that amount is presumptively valid and the burden shifts to the indemnitor to show that a lesser amount should be awarded." (*Aero-Crete, Inc. v. Superior Court* (1993) 21 Cal.App.4th 203, 212.) In light of these principles, it is not sufficient for Sousamian to simply *assert* that Spyksma's $45,000 payment was excessive as compared to the potential damage to which his default exposed her – which he portrays as being confined to the perceived harm to her credit rating. Instead, Sousamian was obligated to provide the court with *evidence* that it was. Then, on appeal, he must persuade us that his evidence effectively precluded the trial from reaching a contrary factual conclusion. "When a trial court has resolved a disputed factual issue, an appellate court reviews the ruling according to the substantial evidence rule. . . . We look at the evidence in support of the trial court's finding, resolve all conflicts in favor of the respondent and indulge in all legitimate and reasonable inferences to uphold the finding." (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1290.) Here, although Sousamian acknowledged at trial that his default on the coach lot loan could possibly harm Spyksma's credit rating, he apparently made no attempt to quantify the value of that harm. And on appeal, he does not explain why the desire to avoid it could not have been worth the $45,000 Spyksma paid. We consequently infer that it was.

8

DISPOSITION

The judgment is affirmed.  Spyksma is to recover her costs on appeal.


RYLAARSDAM, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.